UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK AT
CENTRAL ISLIP
----------------------------------------------------------------X
FAIZ KHAN M.D.

Civil action:
2:24-cv-04745-OEM-ST

                               Plaintiff,

**AMEDNED VERIFIED
COMPLAINT PURSUANT TO
FED.R. CIV. RPOC. 15 FOR
PRELIMINARY INJUNCTION
PURSUANT TO FED. R. CIV.
PROC. 65; MANDATORY
PRELIMINARY INJUNCTIO
PURSUANT TO FED. R. CIV.
PROC 65; INJUNCTIVE RELIEF
PURSUANT TO 42 USC SEC.
1983 AND DECLARATORY
JUDGMENT PURSUANT TO
28 USC SEC. 2201 ET.SEQ.**

       -against-

James McDonald MD in his official
capacity as Commissioner of NYS
Department of Health;Joseph A. Giovannetti
in his official capacity as Director of Bureau of
Investigations NYS Department of Health;
Lawrence Burwell, in his official capacity
investigator, New York State Department
of Health;  Brian Cruz in his official
his capacity as investigator  New York
State Department of Health; "John
Doe" and/or "Mary Roe", the last two names
being fictitious whose identity is unknown
to the Plaintiff, the individual(s) intended
being the director or head officer of the
NYS Department of Health Immunizations
Bureau.
                       Defendants.
----------------------------------------------------------------X

     The Plaintiff Faiz Khan M.D. by his undersigned attorneys files this Amended Verified

Complaint pursuant to Fed. R. Civ. Proc. 15 as a matter of right and  complaining against the

defendants hereby sets forth as follows:

1

## **IDENTITY OF THE PARTIES**

1.      At all of the relevant times hereinabove and hereinafter mentioned Plaintiff was and at all of the relevant times is a physician licensed to practice medicine in the State of New York. At all of the times hereinabove and hereinafter mentioned, Plaintiff maintained and still maintains a principal place of business under the d/b/a name Advanced Medicine of Long Island located at 180 Michael Drive, Syosset NY 11791.

2.      At all of the relevant times hereinabove and hereinafter mentioned, the Defendant James McDonald MD ("McDonald") was and still is the Commissioner, appointed state official and head executive officer of the DOH ("DOH").

3.      At all of the times hereinabove and hereinafter mentioned  McDonald maintained and still maintains a principal place of business in the principal regional office of the DOH  located at 320 Carleton Ave Ste 5000 Central Islip, NY 11722 in the county of Suffolk, Long Island, New York.

4.      Defendant McDonald is sued herein in his official capacity because the Plaintiff is seeking relief against the said Defendant as follows: (a) Pursuant to fed. R. Civ. Proc 65 a prohibitive and mandatory temporary injunction in the form and substance set forth in this Verified Complaint; (b) injunctive relief pursuant to 42 USC Sec. 1983 in the form and substance set forth in this complaint; (c) a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. granting the Plaintiff prospective declaratory relief against the state agent defendant as set forth in this Complaint.

5.      At all of the relevant times hereinabove and hereinafter mentioned, the Defendant Joseph Giovannetti ("Giovannetti") was and still is an investigator and the Director of the Bureau

2

of Investigations of the DOH . At all of the times hereinabove and hereinafter mentioned Defendant Giovannetti maintained and still maintains a principal place of business in the regional office of the DOH located at 320 Carleton Ave Ste 5000 Central Islip, NY 11722 in the county of Suffolk, Long Island, New York and a principal place of business c/o NYS department of health, Corning Tower, Room 2438 Albany, NY 12237.

6.      Giovannetti is sued herein in his official capacity because the Plaintiff is seeking relief against the said Defendant as follows: (a) Pursuant to fed. R. Civ. Proc 65 a prohibitive and mandatory temporary injunction in the form and substance set forth in this Verified Complaint; (b) injunctive relief pursuant to 42 USC Sec. 1983 in the form and substance set forth in this complaint; (c) a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. granting the Plaintiff prospective declaratory relief against the state agent defendants as set forth in this Complaint.

7.      At all of the times hereinabove and hereinafter mentioned the Defendant Lawrence Burwell ("Burwell"), was and still is an investigator of the DOH . At all of the times hereinabove and hereinafter mentioned  Defendant Burwell maintained and still maintains a principal place of business in the regional office of the DOH located at 90 Church Street, 4th Floor, New York, NY 10007.

8.      Defendant Burwell is sued herein in his official capacity because the Plaintiff is seeking relief against the said defendant as follows: (a) Pursuant to fed. R. Civ. Proc 65 a prohibitive and mandatory temporary injunction in the form and substance set forth in this Verified Complaint; (b) injunctive relief pursuant to 42 USC Sec. 1983 in the form and substance set forth in this complaint; (c) a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. granting the Plaintiff prospective declaratory relief against the state agent defendants as set forth in this Complaint.

3

9.      At all of the times hereinabove and hereinafter mentioned the Defendant Brian Cruz ("Cruz"), was and still is an investigator of the  DOH .  At all of the times hereinabove and hereinafter mentioned  Defendant Cruz  maintained and still maintains a principal place of business in the regional office of the  DOH  located at 90 Church Street, 4th Floor, New York, NY 10007.

10.      Defendant Cruz is sued herein in his official capacity because the Plaintiff is seeking relief against the said defendant is sued herein in his official capacity because the Plaintiff is seeking relief against the said defendant as follows: (a) Pursuant to fed. R. Civ. Proc 65 a prohibitive and mandatory temporary injunction in the form and substance set forth in this Verified Complaint; (b) injunctive relief pursuant to 42 USC Sec. 1983 in the form and substance set forth in this complaint; (c) a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. granting the Plaintiff prospective declaratory relief against the state agent defendants as set forth in this Complaint.

11.      The defendants John Doe" and/or "Mary Roe",  are fictitious names  whose identity is unknown to the Plaintiff, the individual(s) intended  being the director or head officer of the NYS Department of Health Immunizations Bureau.  Upon information and belief the defendants John Doe and Mary Doe maintain regional offices at 320 Carleton Ave Ste 5000 Central Islip, NY 11722 in the county of Suffolk, Long Island, New York.

12.      The defendants "John Doe" and/or "Mary Roe" are sued herein in their official capacities as the director or head officer of the NYS Department of Health Immunizations Bureau because the Plaintiff is seeking relief against the said defendant as follows: (a) Pursuant to Fed. R. Civ. Proc 65 a prohibitive and mandatory temporary injunction in the form and substance set forth in this Verified Complaint; (b) injunctive relief pursuant to 42 USC Sec. 1983 in the form and substance set forth in this complaint; (c) a declaratory judgment pursuant to 28 USC Sec. 2201

et.seq. granting the Plaintiff prospective declaratory relief against the state agent defendants as set forth in this Complaint.

## JURISDCTION

13.    The United States District Court for the Eastern District of New York has subject matter federal question jurisdiction over this matter because pursuant to 28 U.S.C. § 1331, and 42U.S.C. § 1983, the claims set forth herein arise under the Constitution and statutes of the United States, namely the First, Fourth Fifth and Fourteenth amendments of the US Constitution.

## VENUE

14.    Pursuant to Fed. R. Civ. Proc 1391(b)(1) venue is properly based in the Eastern District of New York because the defendant James McDonald maintains a principal place of business at  320 Carleton Ave Ste 5000 Central Islip, NY 11722 in the county of Suffolk, Long Island, New York. Pursuant to Fed. R. Civ. Proc 1391(b)(2)  venue is properly based in the Eastern District of New York because a substantial part of the events or omissions giving rise to the claim occurred at Plaintiff's place of business located at 180 Michael Drive, Syosset NY 11791. Both the residence of the defendant McDonald and the place where a substantial part of the events giving rise to this action occurred in Suffolk and Nassau County New York which are within the territorial judicial district of the Eastern District of New York.

## RELIEF SOUGHT

15.    The Plaintiff is seeking an order pursuant to 28 USC Sec. 2201 et.seq. and Fed. R. Civ. Proc. 45 declaring the administrative subpoena issued by the respondents (EX A hereto) null and void as violative of the Fourth Amendment.

16.     The Plaintiff is seeking a mandatory preliminary injunction pursuant to Fed. R. Civ. Proc. 65 mandating that the respondents reinstate Plaintiff's access to the New York State Immunization Information System ("NYIIS") over which they have exclusive possession and control. Such access is necessary to prevent immediate harm to the Plaintiff through the continued violation of his Fourteenth Amendment rights as set forth below in this pleading. The immediate reinstatement of access to NYSIIS  to allows the Plaintiff to comply with the legal mandates of New York regulations and requirements and to log in information pertaining to vaccine administration pursuant to the Commissioner's regulations and requirements.

17.     As set forth below, the Defendants without any explanation summarily and illegally locked the Plaintiff out of the NYSIIS without any hearing and opportunity to be heard and without any explanation for such a summary unauthorized administrative action. Such action amounts to a violation of Plaintiff's Fifth and Fourteenth Amendment rights to practice his vocation without unreasonable government interference.

18.     Such action also amounts to a de facto restriction imposed upon Plaintiff's license by the Defendants without authority and without  any formal hearing or opportunity to be heard as provided by the Fourteenth amendment and as formally provided by Mew York Public Health Law ("PHL") Sec. 230 and the State Administrative Procedure Act ("SAPA") Sec. 301 through 401 as discussed below.

19.     The Plaintiff is seeking a prohibitive temporary injunction pursuant to Fed. Rule Civ. Proc. 65 pending the hearing and determination of the claims in this complaint preliminarily enjoining the defendants them from administratively and summarily excluding him and locking him out of the NYSIIS for the purposes of illegally prohibiting him from practicing his profession without unreasonable government interference and without a notice and opportunity to be heard.

6

The Plaintiff contends that such conduct violates both his Fourteenth Amendment due process rights and his Fifth Amendment right to practice his profession without unreasonable government interference and it causes immediate irreparable .

20.    The Plaintiff is seeking a preliminary injunction pursuant to Fed Rule Civ. Proc. 65 pending the hearing and determination of Plaintiff's claims, staying or preliminarily enjoining the Defendants, their servants agents and assigns from enforcing of seeking to enforce the subpoena issued by Defendant Giovannetti – EX A hereto based upon the fact that the same violates the Fourth Amendment of the US Constitution and New York law as set forth below.

21.    The Plaintiff is seeking a preliminary injunction pursuant to Fed. R. Civ. Proc. 65 pending the hearing and determination of Plaintiff's claims, staying or preliminarily enjoining the Defendants, their servants agents and assigns from continuing or causing to continue the investigation commenced under case Inv. No, DOH-0905(c) based upon the fact that the same investigative process is used as a conduit for defendant's engaging in a systematic pattern of harassment against the Plaintiff while all at the same time violating Plaintiff's First, Fourth Fifth and Fourteenth Amendment rights as set forth in this complaint.

22.    The Plaintiff is seeking a preliminary injunction pursuant to Fed R. Civ Proc. 65 pending the hearing and determination of Plaintiff's claims, preliminarily enjoining the Defendants, their servants agents and assigns from acting or in any way causing to act against the Defendant based upon the provisions of Education law Sec. 6530(28) based upon his Fourth Amendment challenge of the administrative subpoena and refusal to answer the same based upon the fact that: (a) the subpoena does not afford the Plaintiff adequate time to challenge the same in court in accordance with the thirty days' time limitations imposed by the legislature pursuant to Education law Sec. 6530(28) and (b) the demand for records is unconstitutional, it violates

Plaintiff's First, Fourth, Fifth and Fourteenth Amendment rights as set forth below. The demand for records also amounts to an impermissible randomized open ended inquiry into Plaintiff's business for the in hopes of finding violations of the law.

23.    The Plaintiff is seeking a permanent injunction pursuant to 42 USC Sec. 1983 prospectively enjoining the state defendants, their agents servants and assigns from violating Plaintiff's First, Fourth, Fifth and Fourteenth Amendment rights as set forth below.

24.    The Plaintiff is seeking a declaratory judgment pursuant to 28 USC Sec. 2201 et seq. as follows:

(a)    Declaring Public Health Law Sec. 206(4)(a) and Public Health Law Sec. 12-a(1) unconstitutional as applied by the Defendants and as violative of the Fourth Amendment for the purposes vesting the investigators of the NYS DOH with powers to issue subpoenas which they simply cannot have under the Fourth Amendment.

(b)    Declaring Defendants' conduct in baring Plaintiff's access to NYSIIS as unconstitutional and a violation of Plaintiff's Fourteenth and Fifth Amendment rights for all of the reasons articulated hereinabove.

(c)    Declaring Defendants' prospective entry of Plaintiff's premise for the purposes of gathering information, taking photos and engaging in a pattern of harassment as being violative of the Fourth Amendment for all of the reasons articulated hereinabove.

(d)    Declaring the subpoena issued by the investigator Defendants as being violative of the Fourth Amendment for all of the reasons articulated above.

## BRIEF STATEMENT OF THE CASE.

25.    This case arises from defendants' multiple initiated and continued violations of Plaintiff's constitutional rights safeguarded by the First, Fourth, Fifth and Fourteenth Amendments

8

of the US Constitution.

26.    In this case the plaintiff is seeking prospective injunctive and declaratory relief enjoining the state officials from continuing to violate Plaintiff's constitutional rights under the color of the New York investigative process of the Health Department.

27.    Notably none of the defendants in this action are state agencies charged with the investigation and prosecution of professional medical conduct. That task is specifically reserved by the legislature who enacted PHL Secs. 230 through 230-a to  the Board of the Professional Medical Conduct ("BPMC") in its oversight investigative and adjudicative capacity ant to  the Office of Professional Medical Conduct ("OPMC").

28.    From the first initiating call of April 23-24, 2024 by state defendant Cruz all through the date of this Amended Complaint, the defendants engaged in a concerted pattern of harassment, multiple constitutional violations and fraudulent behavior and false pretenses  aimed at inducing the Plaintiff to make statements to the state agents and turn over information, all under the guise of an investigation pertaining to Plaintiff's vaccine administration to his patients.

29.    Through the use of false and fraudulent statements and pretenses, accusations, summary imposition of a license restriction without due process and authority and demand for irrelevant medical records, the defendants went on a witch hunt against the Plaintiff in an unchecked and unsupervised field search. That search and defendants' actions specified herein, culminated with the violation of Plaintiff's Fourteenth Amendment rights through  the summary action of administratively barring the Plaintiff from his ability to vaccinate his patients, imposing a license restriction without authority and due process  and with  the issuance of a harassment subpoena which violates both the Fourth Amendment and New York law as described below.

30.     In addition, the defendants sought to act in excess of their powers and subject matter jurisdiction by seeking to investigate Plaintiff's practice of complementary medicine which is safeguarded under New York state Education Law Sec. 6527(4)(e) and Public Health Law Sec. 230(9-b). They have an outstanding demand made without authority for the production of medical information which is safeguarded by the First Amendment as well as by the foregoing New York Law.

31.     The defendants  violated and continue to violate Plaintiff's Fourth Amendment rights by repeatedly entering Plaintiff's place of business without a warrant and exercising coercion and intimidation upon the Plaintiff in order to obtain information. They are repeatedly violated Plaintiff's Fourth Amendment rights by illegally  obtained access to plaintiff's premises to conduct a search in violation of Plaintiff's Fourth Amendment rights.

32.     The defendants  sealed off their Fourth Amendment violations with the issuance of an administrative subpoena signed by an investigator who under the Fourth Amendment neither has the power nor the authority to issue such subpoena. The subpoena further violates the Fourth Amendment because it is overbroad, is issued without authority, it does not afford the Plaintiff sufficient time to challenge the same in Court (30 days as provided by the New York Legislature under Education law Sec. 6530(28)) and it seeks documents which are beyond the scope of the investigative and inquisitorial powers of these particular defendants.

**FACTUAL BACKGROUND**

**(i)     In general – the true identity and purpose of the investigating defendants.**

33.     To keep things in context, upon information and belief, the Defendants Giovannetti, Cruz and Burwell are part of a DOH team which was purposely formed by the  DOH  in January 2021 at the height of the COVID 19 pandemic to hunt down healthcare practitioners and other

individuals who provided fake COVID 19 documentations and fraudulent COVID 19 vaccine documentations to individuals seeking to avoid the draconian and politically imposed New York vaccination mandates on healthcare practitioners and the public as a whole.

34.    The hunt team was actually given a name: the Department of Health Vaccination Complaint Investigation Team and was tasked with looking into complaints of COVID19 vaccine fraud. https://health.ny.gov/press/releases/2021/2021-10-01_doh_statement.htm.

35.    In its inception, and during the COVID 19 emergency, the hunt team uncovered various individuals who provided fake vaccination cards to their clients or   patients and fake vaccine documentation. https://health.ny.gov/press/releases/2021/2021-10-01_doh_statement.htm;

https://www.health.ny.gov/press/releases/2022/2022-12-20_vaccination_card.htm

https://wjla.com/news/nation-world/ny-man-facing-felony-charges-for-presenting-a-fake-vaccine-card.

https://www.msn.com/en-us/news/crime/ny-nurse-guilty-in-15m-covid-vaccine-scam-blames-government-mandates/ar-AA1gOEQN.

https://www.health.ny.gov/press/releases/2024/2024-01-17_baldwin_midwifery.htm

36.    Clearly, the hunt team gathered celebrity status and notoriety during the COVID 19 emergency vaccination mandates during 2021-2022.

37.    On May 24, 2023 the DOH announced as follows: "Due to the changing landscape of the COVID-19 pandemic and evolving vaccine recommendations, the  DOH  has begun the process of repealing the COVID-19 vaccine requirement for workers at regulated health care facilities. Throughout the public health emergency, this vaccine requirement served as a critical public health tool, helping to protect both health care workers and the patients under their care. As

the repeal of this regulation awaits consideration for approval by the Public Health and Health Planning Council (PHHPC), the Department will not commence any new enforcement actions." https://www.health.ny.gov/press/releases/2023/2023-05-24_statement.htm."

38.    On October 4, 2023, the COVID-19 vaccine mandate for health care workers in New York was officially repealed. On September 18, 2023, the DOH (NYSDOH) submitted a Notice of Adoption to repeal 10 N.Y.C.R.R. 2.61 (the Regulation), which was the emergency regulation requiring covered health care employers to ensure that their personnel were fully vaccinated against COVID-19.

39.    The vaccine mandates imposed upon private employers in New York City were terminated on November 1, 2022.

40.    On September 12, 2022 the New York State Governor terminated the COVID 19 state of emergency and did not extend it beyond September 12, 2022.

39.    Apparently intoxicated by their own fame and harboring a delusion that they are above the Fourth Amendment of the US Constitution, the defendants violated and continue to violate every possible applicable aspect of protection afforded to the Plaintiff by the US Constitution's First, Fourth, Fifth and Fourteenth Amendments.

40.    The defendants apparently and erroneously harbored the delusion that the DOH investigators of the hunt team have unfettered and unchecked powers and discretion to created their own complaint by scouring the database of the New York State Vaccine Information System ("NYIIS") and use it as a pretext to enter Plaintiff's business premises unannounced without a warrant for the purposes of conducting, Fourth Amendment protected search and seizure. The defendants further harbored the delusion of grandeur that they are vested with unlimited an unfettered powers to harass the Plaintiff through impromptu interrogations, erroneous insinuations

and scare tactics which violate both the US constitution and New York law. For some unknown reason, the three defendant investigators of the Vaccination Complaint Investigation Team (Cruz, Burwell and Giovannetti) in collaboration and in conspiracy with the Commissioner and defendants John Doe and Mary Doe, Directors of the Immunization Bureau, are continuing to scour the New York State Immunization Information System ("NYIIS") and use the now irrelevant investigative COVID 19 investigative process to engage in a systematic pattern of harassment against the Plaintiff and to specifically target him for no other reason than the fact that he provides complementary medicine services related and unrelated to vaccine adverse reactions and/or actual; vaccine injuries.

41.     As published by the media and upon information and belief, according to Joseph Giovannetti, the department's director of investigations, the team began looking into frauds involving all sorts of vaccines, not just for COVID, and at the end of 2022. https://nymag.com/intelligencer/article/midwife-vaccines-new-york-long-island-false-immunization-records.html

42.     In short, even now, after the repeal of all COVID 19 emergencies and mandates in this state, by Defendants' own admission made by Defendant Giovannetti himself to the media, and as set forth in the subpoena in this case, the Defendants commence unfettered inquiries into New York licensed physicians' businesses and vaccination practices based upon NYSIIS data in hopes of finding violations of the law.

43.     Apparently, the defendants continue to commence and investigate and systematically harass anyone who comes into their crosshairs in hopes of obtaining confessions of violations of the law based upon the investigators' knowingly false recitations of the law and

13

false accusations levied against Dr. Khan about the violation  the of the same. Such conduct violates basic principles of New York and constitutional law as discussed below.

44.    In the process of living in their own abusive investigative world which is predicated upon bullying and intimidation of unsuspecting medical licensees such as Dr. Khan, the Defendants vest themselves with powers which they do not constitutionally or statutorily have.

45.    Those lacking powers include the non-delegable power to issue subpoenas vested by the legislature exclusively in the Commissioner of Health under PHL Sec 236(4)(a); entry upon a business premises to gather information without a warrant; intimidation, coercion, false recitation of the law and accusations of matters which are not illegal.

46.    The Fourth Amendment prohibits the investigators from paying impromptu visits and enter Plaintiff's business under false pretenses or for any other reason for that matter without a warrant signed by a judge.

47.    The medical profession as a matter of law is not a pervasively regulated business which implies consent to such illegal and unconstitutional entries and searches. While for example, as a condition to the issuance of a license by the DEA for the prescription of schedules substances explicitly grants the DEA agents permission. To come and effectuate spot compliance checks with the provisions of the Controlled Substances Act and the DEA regulations, simply possessing a medical license does not vest the state agents with equal entry powers as in the case of the DEA controlled substances checks. That simple concept matters not to the investigative agents at all in this case.

48.    Similarly, the investigators do not have any powers to enter the Plaintiff's premises and engage in a systematic patter of harassment by quizzing him on the knowledge of various aspects of New York law applicable to the regulation and practice of medicine because such

conduct violates the Fourth, Fifth and Fourteenth amendment and give rise for an action for injunctive relief under 42 USC Sec. 1983.

49.    Government investigators, such as the ones in this case who knowingly violate Plaintiffs' Fourth amendment rights as discussed in this pleading are not immune from suits for monetary damages as per the decision of the  US Supreme Court's case of  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388.

50.    Finally neither the investigator Defendants, nor the Commissioner have any powers or subject matter jurisdiction to impose a de facto restriction on Plaintiff's license to practice medicine by shutting down his ability to administer vaccines through  summarily, and without a hearing and opportunity to be heard excluding him and locking him out of the NYSIIS. This is a flagrant violation of Plaintiff's Fifth and Fourteenth amendment rights.


**SPECIFIC FACTS RELEVANT TO THE RELIEF SOUGHT**

**(i)    General background.**

51.    Plaintiff is  a New York State physician licensed to practice medicine in this state. His license number is 211517 and it was issued on 08/10/1998. Annexed hereto as EX C is Plaintiff's current CV. Highlights of the CV will be outlined below. It is extremely important for the Court to understand Plaintiff's illustrious and high profile medical background while considering defendants' actions against him as alleged in this Amended Verified Complaint.

52.    Plaintiff  graduated  Albany Medical School in 1995. The medical school is  part of the prestigious Union University which encompasses Union College, Albany Pharmaceutical School and Albany Law School as well.

53.     Dr Kahn has never been disciplined by the New York Board of Professional Medical Conduct.  He possess an unrestricted license which is supposed to allow him to practice medicine free of any governmental restrictions.

54.     Dr. Khan achieved dual Board status in Internal medicine and Emergency Medicine.  He is currently Board certified by the American Board of Emergency Medicine and he specializes in Emergency Medicine and Internal medicine.

55.     Dr. Khan's contributions to the medical community and his medical background contain significant high-profile achievements which in turn enabled and still enable him to help very sick patients.

56.     By training and practice the Plaintiff  is a dual specialist in  emergency medicine and internal medicine.

57.     Dr Khan's     professional experience in the medical field encompasses the following:

(i)     ***Attending Emergency Physician – Khan Medical PC*** Jan 2018-present. Locum Tenens: St. Vincent's  Hospital System- Indianapolis, IN; Virtual Hospital Network – Marlton, NJ.

(ii)     ***Department Chair / Medical Director:*** **Emergency Medicine, Kingston Hospital – Health Alliance of Hudson Valley, Kingston NY**.  Emergency Medicine Associates.     Feb 2010- June 2011. Responsibilities included: (a) Supervision of clinical operations for a 50,000 patients per year, level II trauma designated emergency department; (b)  Maintenance and improvement of quality benchmark indicators and metrics for the emergency department; (c) Media, community and EMS outreach and educational initiatives; (d) Faculty guidance and

16

recruitment; (e) Development of policies / procedures and educational initiatives to nursing and nursing extenders.

 (iii) ***Vice-Chairman*: Department of Emergency Medicine, Nassau University Medical Center, East Meadow, NY.** Jun 2007 – Mar 2010. Responsibilities included: (a) Supervision of clinical operations for a 70,000 patients per year, level Plaintiff trauma designated emergency department; (b) Maintenance and improvement of quality benchmark indicators and metrics for the emergency department; (c) Implementation of clinical care quality protocols: (i) acute coronary syndrome, stroke, psychiatric emergencies, respiratory failure;(ii)achieved stroke center designation; (d)Implementation of patient throughput enhancing work-flow measures: Bedside registration, rapid assessment pathways, parallel support process optimization, inpatient transition streamlining; (e) Augmentation of ED preparedness measures; (f) Optimization of revenue cycle in relation to work-flow and documentation; (g) Planning and development of 35 million dollar new facility design; (h) Media, community and EMS outreach and educational initiatives;(i) Faculty guidance and recruitment; (j) Development of policies / procedures and educational initiatives to nursing and nursing extenders; (k) Head of Academic Affairs / Site Director – North Shore / Long Island Jewish Medical Center Emergency Medicine Residency; (l) Executive Committee: Graduate Medical Education 11/2007 – 7/2010; (m) Institutional  Review Board, Nassau University Medical Center 2007 – 2009

 (iv) ***Chairman:*** Medical Ethics Committee - Nassau University Medical Center, East Meadow, NY. Jul 2007 – Feb 2010.

 (v) ***Director*: Medical Observation Unit – Department of Emergency Medicine, Milton S. Hershey Medical Center, Hershey, PA** Sep 2005 – Jul 2007; Responsibilities included: (a)  Supervision of operations for a clinical decision unit within a 55,000 patient per

year level Plaintiff trauma designated emergency department; (b)   Augmenting volume of the observation process to enhance ED through-put and optimize inpatient resource utilization; (c) Monitoring utilization and quality indices for the medical observation process; (d) Assistant Residency Director / Core Faculty – Department of Emergency Medicine Penn State College of Medicine;   (e) Founder and Director: Senior Medical Resident Rotation with Emergency Medicine/ Internal Medicine Admission and Tracking Process – Penn State / Hershey Medical Center; (f) Quality Assurance Committee – Emergency Department.

(vi)     **Hospitalist**: Department of Internal Medicine, Milton S. Hershey Medical Center, Hershey, PA Sep 2005 – Jul 2007.

(vii)     **Attending Physician/ Core Faculty**:  Department of Emergency Medicine, North Shore/Long Island Jewish Medical Center, New Hyde Park, NY.  Aug. 2000 – Sept. 2005.

(viii)   *Associate Residency Director*: Combined Emergency / Internal Medicine Program, Long Island Jewish medical Center / Albert Einstein College of Medicine, New Hyde Park, NY.

(ix)     **Attending Physician**:  Department of Emergency Medicine, North Shore / Forest Hills Hospital, Forest Hills, NY. Jul 2000 – Jul 2002.

58.    Dr Khan's emergency medicine background enabled him to become one of the founders of **City MD.** City MD does not need much introduction because anyone driving or walking around the metro New York area is familiar with those emergency walk in centers. It is one of the first of its kind private urgent care centers in Metropolitan New York City which revolutionized emergency patient care and lessened the pressure on the hospital emergency rooms while providing patients with a safe and competent environment of private urgent care.

59.    Therefore  Plaintiff's medical credentials and experience also includes him being a founder and co-owner of City MD Urgent Care, New York City Dec 2010-present.

18

60.     Dr. Khan's  current position with City MD  is Executive Vice president and coordinator of physician development. Plaintiff served as the medical director of City MD from dec 2010 to December 2014. Plaintiff was responsible for designing, and implementing all facets of clinical operations, medical quality control, efficiency and error reduction protocols. Dr. Khan was  follow-up care coordination. He is responsible for strategic growth initiatives including marketing, branding, media development, clinical and non-clinical staff recruitment.

61.     Plaintiff  developed an interest and passion for complementary (aka integrative) medicine with respect to the treatment of chronic illnesses such as chronic disease conditions – neurodegenerative, immune dysregulations, endocrine/fatigue problems, cancer support, orthopedic complaints, chronic pain,  autism and others.

62.     Dr. Khan opened Advanced Medicine Long Island in 2019 at his current medical office in Syosset with the goal of offering a blend of complementary and conventional medicine treatments to his  patients.

63.     Because this case involves a dubious investigation regarding Dr. Khan's vaccination practices, several things are important to be understood from the get-go, which the defendants in this case simply reject, as it appears from their request for records appearing in the subpoena EX A hereto.

64.     There is a difference between complementary/integrative  medicine and alternative medicine. Alternative medicine seeks to replace conventional allopathic medicine. Complementary/integrative  medicine does not replace conventional medicine, but it complements it by offering non-conventional approaches that are integrated into a treatment plan, which potentially enhance the chances of patients to recover while receiving conventional medical treatments for their conditions. Dr Khan does not offer alternative medicine treatments.

65.     Nor does Dr Khan offer homeopathic alternatives to traditional vaccination. Item #4 of the subpoena requests the production of documents reflecting Dr. Khan's offering of homeopathic remedies to traditional vaccinations. He does not do any such thing.

65.     Developed in Germany more than 200 years ago, homeopathic medicine is based on the belief that the body can heal itself. Its unconventional approach aims to treat the whole patient using medicines made from highly diluted plants and other natural elements. Homeopathic treatment is customized for each patient. Its underlying principles are the law of similar, the single remedy, and the minimal dose.

66.     There is no such thing as a homeopathic alternative to vaccines and that is not what Dr. Khan does in his practice. Therefore, in this case it is inconceivable why the defendants demanded in item #4 of the subpoena the production of pamphlets and materials which they say that the Plaintiff gives to patients that support homeopathic replacements of traditional vaccines.

67.     Administering vaccines and dealing with a variety of side effects is part of Dr Khan's emergency medicine training, knowledge and practice.  Offering homeopathic remedies as alternatives to vaccines is simply not what Dr Khan does  nor is it something that he has ever done.

68.     Dr. Khan  does offer consultation and advice on protocols in complementary medicine modalities to patients who seek such, in the context of vaccination. There is a concern amongst the public regarding potential adverse effects of current vaccination schedules. Dr. Khan reviews ways to potentially lessen the risk of adverse vaccine effects, which may at times lead to serious or prolonged illness.

69.     Dr. Khan  also offers complementary medicine treatments to patients who may have suffered vaccine adverse effects as part of their presenting condition. He neither counsels

alternatives to vaccines nor does he ever counsel deviation from vaccinations and vaccine schedules.

70.     Because Dr Khan's private practice does not focus on vaccinations, but rather on the use of complementary/integrative medicine to treat chronic illnesses, and because the business model of the practice is completely private pay with no insurance (state or private) accepted, there are several issues with attempting to fit such business models into the conventional insurance pay on oversight model.

71.     For example, as mentioned above, patients may consult with Dr Khan because some acquaintance or member of their family suffered an adverse effect from a vaccine, and they wish to learn about ways to increase their physiologic resiliency to potentially mitigate the risk. As part of the consultation – they learn that in the event of an adverse reaction, they can be followed up and treated with higher level complementary medicine modalities to potentially counteract or lessen the severity of the outcome.

72.      Traditionally, the pharmaceutical industry, and the federal and state regulatory arms such as the FTC, FDA and state health departments and medical boards have been hostile to alternative medicine because they were directly competing with pharmaceutical therapies and attempting in their treatment plans to replace them completely.   However, alternative medicine is not what Dr. Khan practice.

73.     New York legislature protects physicians who offer non-conventional treatment modalities from both investigations and disciplinary actions. See Public Health Law Sec. 230(9-b) and Education Law Sec. 6527(4)(e).

74.     Offering complementary medicine treatments to patients who seek to counteract and/or prevent vaccine injuries before or after being vaccinated is not one and the same as offering

alternatives to the vaccines themselves as the defendants accuse him of doing without any basis in item #4 of the subpoena.

75.    With all the foregoing information in mind, including Dr Khan's own high profile medical career, one would wonder what the Vaccine Complaint Investigation Unit of the DOH has to do with someone of Plaintiff's highly accomplished background and significant contributions to the conventional medical field.

76.    One could also not help but wonder about the real reason behind defendants' summary imposition of a restriction on Dr. Khan's medical license, as articulated below in this Amended Complaint by shutting him out of the New York State Immunization Information System ("NYSIIS"). The mandatory participation and input into that database of every administered vaccine is at the core of the predicate for the ability of any physician to offer vaccinations.

**(ii)    The first violation of Plaintiff's Fourth Amendment rights-
the entry, interrogation and search of April 29, 2024.**

77.    On or about April 23rd or 24th, 2024 Dr Khan was contacted via the telephone by Defendant investigator Cruz while Dr. Khan was on vacation.

78.    Dr. Khan asked Cruz what his call was regarding. Cruz refused to disclose the purpose of his call and asked for an in person meeting with the Dr Khan to discuss the reason for his call.

79.    Dr Khan explained that he was on vacation and that he would be back at work in the office on Monday April 29, 2024. Dr Khan asked investigator Cruz to call him back and let him know when he would like to meet, so that Dr Khan could accommodate his visit in Dr. Khan's schedule. Cruz said that he would do so. Since Dr. Khan did not know the nature of this inquiry, Dr. Khan was trying to plan on having his attorney present during the scheduled appointment.

80.     Cruz never called Dr. Khan back.  Rather than respecting Dr Khan's request for an appointment and while precluding any possibility of having Plaintiff's attorney present, investigator Cruz and another investigator introduced as Lawrence Burwell simply appeared at Dr. Khan's office in Syosset, Long Island at 180 Michael Drive, Syosset New York in the morning of April 29, 2024.

81.     Both defendants identified themselves but they did not disclose the purpose of their entry. They did not have a warrant nor did they have any court authority to enter Plaintiff's premises. The Defendants Cruz and Burwell subsequently requested  that Dr Khan speak to them to discuss unidentified issues for which they had questions to ask him. Dr Khan was feeling coerced; however, since he was confident that neither  his practice nor his facility were in violation of any health codes, Dr. Khan did his best to accommodate them.

82.     Because of his prior background in leadership and administrative positions in various hospitals, Dr Khan has  held regulatory roles and has interfaced with various regulatory agencies at the various facilities where he worked. Thus when he met with defendants Cruz and Burwell, his hope and intention was, as per his past experiences,  that this was a preliminary fact finding investigation, and that Dr. Khan's  cooperation and responses would put it to rest. In this instance that is not how it turned out.

83.     In the first place, Dr. Khan  was taken aback at the investigator' unannounced visit. He did feel that if he did not talk to them, it would heighten their suspicion and make things worse, instead of concluding a preliminary stage investigation. Unlike his past experiences and interfacing with regulatory authorities, in effect Dr. Khan felt coerced into talking to defendants Cruz and Burwell.

84.     In the first place, the investigators'  unannounced entry onto Dr. Khan's business

premises precluded his ability to have an attorney present, who could otherwise explain what his options were under the law at that given scenario. It also interfered with Dr. Khan's business schedule which he was forced to abandon for the day.

85.    Without the benefit of counsel Dr. Khan did feel vulnerable to the pressure which was a natural outcome of an unannounced visit by investigators Cruz and Burwell. This pressured Dr. Khan to comply with their interrogation.

86.    The Defendants Cruz and Burwell further represented to Dr. Khan on April 29, 2024 that Burwell was going to be the lead investigator on his case. Investigator Burwell appeared to Dr. Khan to be either a junior investigator or an investigator in training since he appeared to be following the lead of investigator Burwell, and periodically asking him to review his data and asking him questions.

87.    Cruz and Burwell started their interrogation of April 29, 2024 by generally asking Dr Khan about the nature of his medical practice and the types of medical cases and patients that that Dr. Khan sees.

88.    They then abruptly steered the interrogation into Plaintiff's vaccination practices. Plaintiff explained that his practice goals as stated above, involve using complementary and allopathic medicine modalities to treat chronic disease conditions – neurodegenerative, immune dysregulations, endocrine/fatigue problems, cancer support, orthopedic complaints, chronic pain, autism and others. Plaintiff explained that Plaintiff does not function as a conventional vaccination site and Plaintiff does not routinely vaccinate his patients, unless they ask Dr. Khan to do so. Those vaccinations happen in the context of a consultation about potentially mitigating adverse reactions.

89.    Dr. Khan also explained to defendants Cruz and Burwell that some of his patients in general and particularly in the last couple of years, came to know of Dr. Khan's integrative and

complementary medicine background, and would consult Dr. Khan about methods to enhance their immune systems and detoxification pathways, in an attempt to lower the risk of vaccine side effects and injuries.

90.     . Plaintiff further explained that from a general and specific standpoint – some of those patients would ask Dr. Khan if Plaintiff could provide the specific vaccination which they were concerned about, and also provide follow up services and complementary medicine modalities which potentially counteract the adverse vaccine reactions, should they occur.

91.     The investigators then abruptly turned the focus of their questioning by inquiring as to why patients would come to Dr. Khan for consultation regarding vaccines and administration of such, if they could vaccinate with their primary care physician or at mass vaccination sites in the case of COVID 19 vaccines. The investigators noted that Plaintiff had a completely private practice that does not take insurance. Dr. Khan responded again that there were patients who did chose to vaccinate with their usual doctor, but still sought Dr. Khan's consultation for an individualized protocol pre or post vaccination for the reasons articulated above.

92.     Dr. Khan responded by re-iterating what Dr. Khan's practice of medicine was about as set forth above. Patients were concerned with adverse effects from vaccines. Some had family, friends, or acquaintances that had suffered adverse events. Hence, the patients that came to consult with Dr. Khan could be categorized as *vaccine hesitant* concerned with the side effects and adverse reactions of vaccines.

93.     These patients wanted to know if there were ways to build their physiologic resiliency to any potential adverse effects from vaccines, including the recent COVID 19 vaccine, which according to official sources was mandated before full standard evaluations of safety, and hence was legally designated as 'emergency use.'.

25

94.     Plaintiff explained that during the consultations, patients asked about various risks and adverse effects, which Plaintiff would of course address, based on official scientific reporting.

95.     With respect to the recent COVID 19 vaccine, those risks are now, and have been before the instant investigation commenced, recognized and publicized in summaries of official government data.

96.     They include significant known risks of death when compared to the risks of all other vaccines administered since the Vaccine Adverse Event Reporting System ("VAERS") was established in 1990  and significant injury risks including serious bodily harm and adverse effects.

97.     The public domain information regarding the risks of COVID 19 vaccines which patients wished to discuss are available to the respondents as they are to the plaintiff. Specifically, the following site compiles data from various us agencies compiled by VAERS (Vaccine Adverse Event reporting System)   Analysis at https://vaersanalysis.info/2024/06/07/vaers-summary-for-covid-19-vaccines-through-5-31-2024/.

98.     The sources and raw data used by the compilations are as follows:

(a)     Vaccine data (Covid-19 and other vaccines) taken from CDC's VAERS website, located here: https://vaers.hhs.gov/data/datasets.html. VAERS data sets in the form of csv files are pulled down weekly and put into a database for reporting/analysis. Data files are available all the way back to 1990.

(b)     Number of doses distributed for other vaccines found in NVICP Data and Statistics report     here:     https://www.hrsa.gov/sites/default/files/hrsa/vaccine-compensation/data/data-statistics-report.pdf

(c)     Numbers for Covid-19 vaccines administered by manufacturer found here: https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total

26

(d)    Numbers    for    total    Covid-19    vaccine    doses    administered    found    here: https://data.cdc.gov/Vaccinations/COVID-19-Vaccination-Trends-in-the-United-States-N/rh2h-3yt2

(e)    Numbers for Flu vaccine doses administered for 2019-2020 season found here: https://www.cdc.gov/flu/fluvaxview/coverage-1920estimates.htm

(f)    Numbers for FDA regulated drugs taken from FDA's FAERS website, located here: https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

99.    The data reports for COVID 19 Vaccines through 05/29/2024 indicates that from December 2020 through May 31, 2024 (period of three and a half years), there were in the US 1,011,672 COVID 19 vaccine related adverse reactions reported as compared to the data related to all other vaccines from 1990 through May 31 2024 (period of over 34 years)  which is 849,527. See EX 13 hereto.      In average, the COVID 19 reported adverse reactions are 24,087 per month for the entire duration since when the vaccine administration was rolled out as opposed to 2082.17 adverse reactions per month for all of the CDC recommended vaccines since the VAERS system was initiated in 1990.

100.    The disproportionality of vaccine injuries and death  related to COVID 19 vaccines when  compared  with  the  vaccine  injuries  for  all  other  vaccines  since  the  initiation  and establishment  of  the  Vaccine  Adverse  Events  Reporting  Systems  in  1990 https://vaers.hhs.gov/about.html according to these reports is nothing short than frightening.

101.    According to the data publicized and summarized on the foregoing web site and compiled from sources of the US Government,  from December 2020 when COVID 19 vaccines were initiated on December 2020 through the date of the most recent report of May 31, 2024 the

death incidents attributed to COVID 19 vaccines in the US are 15,165.00. That is an average of 361.071 deaths a month for three and a half years (42 months). By comparison the total number of deaths attributed to all other vaccines since 1990 is 10,611.00. That 26 deaths per months for a period of 408 months attributed to all other vaccines.

103.    Consequently, the heightened risks of death associated with COVID 19 vaccines are public knowledge. Therefore the investigator's questioning as to why would patients come to Dr. Khan to seek consultations regarding vaccine injuries, in light of the public domain data, such are nothing less than then use of the New York vaccine investigative process to intimidate and prevent the Plaintiff from exercising his First Amendment to discuss such data with his patients, and the patients' First Amendment right to obtain such consultations and information.

103.    The mandatory disclosure requirement of a death risk associated with COVID 19 vaccine is a legal standard and not a "standard of care" subject to the weighing and consideration of any expert testimony. Therefore, the investigation launched by the respondents is aimed at intimidating and stifling such disclosures which are protected by the First Amendment.

105.    In addition to the inordinate amount of documented deaths associated with the CIOVID 19 vaccines, at the time when the investigation was commenced the serious risks of side effects associated with COVID 19 vaccines and the reason why the patients felt scared and came to the Plaintiff for counsel and his expertise in how to minimize the risks of injury should have been known to the investigators and their supervisors.

106.    The CDC, which is the federal authority that Health Department officials loved to quote during the COVID 19 emergency recognizes the presence of serious adverse reactions to occur which are attributed to COVID 19 vaccines.

107.    The documented risks associated with COVID 19 vaccines and reported by the federal agencies – can be found for example on the CDC web site at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html., as well as in scientific articles.  The known risks are as follows: (a) High risk of death when compared to the death rates of all vaccines  as discussed in the Amended Verified Complaint; (b) ischemic strokes (articles and CDC lead posting) –;  (c) autoimmune reactions which have to be identified and treated                                immediately;                                (d) anaphylaxishttps://www.cdc.gov/mmwr/volumes/70/wr/mm7002e1.htm?s_cid=mm7002e1_w  – EX C hereto; (e) Guillain-Barré Syndrome (GBS) after COVID-19 Vaccination and scientific articles disclosed by the CDC related to the same  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html.   GBS is a rare disorder in which the body's immune system damages nerve cells, causing muscle weakness and sometimes paralysis. GBS has largely been observed among people ages 50 years and older. (f) myocarditis and pericarditis - https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html and  scientific articles related to the same – (g) Thrombosis with Thrombocytopenia Syndrome (TTS) after COVID-19 Vaccination Thrombosis with thrombocytopenia syndrome. TTS is a rare but serious adverse event that causes blood clots in large blood vessels and low platelets (blood cells that help form clots). See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html and scientific articles;  A review of reports indicates a causal relationship between the COVID-19 vaccines and TTS.

108.    The disclosure of the risks of the foregoing vaccine injuries associated with COVID 19 vaccines as well as counseling and discussion of the same is mandated by  New York law and

not subject to investigation, prosecution and persecution by the defendants under the rubric and disguise of "vaccine fraud".

109.    Dr. Khan  further explained to the investigators that in case of all vaccines administration done at his practice (with the exception of COVID 19),  the patients had to cover the cost of vaccine procurement. The reason for that is that Dr. Khan's practice is not a routine vaccination practice, hence  Plaintiff does not have surplus back-up stock like primary care practices, and hence Plaintiff need to procure the vaccines from appropriate sources. This happened in cases where the consultation led the patients to feel more comfortable vaccinating at Dr. Khan's practice.

110.    Dr. Khan also explained to the investigators that he always  made it clear that the patients could proceed to vaccinate through their conventional in-network plan/provider, and not bear the cost of procurement.

111.    In addition, in response to the investigator's questions regarding why the patients came to him to seek medical advice regarding vaccinations, Plaintiff explained that as part of the consultation – a patient would, if necessary, be entitled to an urgent (within 24 hours – assuming Plaintiff am not away), no-charge evaluation in case of potential adverse effects. If needed, because the patient sought Dr. Khan for his complementary medicine approaches to vaccine injuries and vaccine adverse reactions, such protocols would have been made available to the patients in case complications and adverse reactions occurred.

112.     Plaintiff further explained to the investigators in response to the question of "why Dr. Khan for consultation and vaccination", that these patients:

a.    Were already concerned about adverse effects of vaccinations and sought out the appropriate expertise in discussing these and potential ways to mitigate their risks

30

     b.     Felt comfortable with an integrative physician who was not dismissive or hostile to their concerns about adverse reactions. They also expressed how their conventional medical network experience was often rushed, impersonal, and felt that they could not fully voice their concerns due to the dismissiveness of staff.

     c.     In the context of COVID 19 mass vaccine sites, many felt it was an impersonal 'assembly line' experience using a product that was not completely tested for safety, where their concerns could not be answered due to the lack of expertise of the mass vaccination site provider; This was fully recognized by  NY State officials, ***which is why the policy makers allowed  private physicians access to the vaccines, since they understood patients felt more comfortable (and have a right to do so)  in the setting of a trusted physician, rather than a rushed, impersonal, or dismissive process.***

     d.     The patients  also chose to consult with Dr. Khan and or vaccinate at Dr. Khan's practice since they understood that, assuming Plaintiff was not away, Plaintiff would be available on an urgent basis, should there arise any adverse reaction post vaccination – since there are more intense therapies that can be used to try and minimize a vaccine induced adverse event.

     e.     Due to the above, most (not all) who consulted Dr. Khan, felt more secure and comfortable to be vaccinated in Dr. Khan's practice and were willing to bear the cost of procuring the vaccine.

113.   Dr Khan strongly suspected during the questioning by the investigator defendants Cruz and Burwell of April 29, 2024, that Plaintiff had been unfairly profiled and targeted for interrogation due to the atypical and completely private nature of Dr. Khan's practice and the complementary and integrative nature of the same, which included care for vaccine injuries and

prophylactic non-conventional care aimed at counteracting vaccine adverse reactions and vaccine injuries.

114.    Cruz and Burwell then  asked Dr. Khan about the costs associated with this consultation and vaccination or lack thereof and Plaintiff  explained the same. Plaintiff explained once again that the cost covered the vaccine procurement and a standard fee for consultation - which took into consideration each patients individual physiologic attributes and prior medical history in composing guidelines to increase resiliency again potential adverse effects from vaccines.

115.    During the questioning Cruz and Burwell asked Dr. Khan if Plaintiff knew Dr. Jim Campasano.

116.    Plaintiff replied in the affirmative. Plaintiff knew of the identity of this individual because he was a former student of Dr, Khan and was involved with City MD. They are colleagues and friends – and are on the same  group texts on occasion.

117.    Dr. Campasano allegedly got hold of Covid cards and was accused of giving them to relatives/friends. Therefore Plaintiff became attuned to the fact that the investigation and the question implicated 'suspicion by association' and was targeting Dr. Khan for being a colleague and friend with this doctor in the past.

118.    It became even more apparent that the defendants Cruz and Burwell were targeting Dr. Khan during the questioning of April 29, 2024 by exploring any connection between an individual called Jeanette Breen and Dr. Khan, and asking Dr. Khan if Plaintiff knew her.

119.    Dr Khan  did not know who Janet Breen was when the investigators asked of his knowledge of this person. During the interrogation, Plaintiff realized from the investigators' information given to him that she was a midwife in Long Island who was found in violation of

vaccine policy, by giving homeopathic drops to pediatric patients and entering such as valid childhood vaccinations into NYSIS. Plaintiff remember asking Cruz *'how did a midwife get entry into NYSIS?'* He declined to answer. Plaintiff also realized that the reason why the defendants asked in item #4 of the subpoena for documents handed out by the Plaintiff to his patient which promote homeopathic alternatives to vaccines is because they were attributing Breen's action and guilt by association to the Plaintiff for some unknown and undisclosed reason.

120.    After the investigators' departure at the conclusion of the April 29, 2024 interrogation, Plaintiff performed a quick internet research of the name and discovered that Breen was a mid-wife who stood accused of falsifying vaccine records of roughly 1500 children. This was announced by DOH in January of 2024 and she was fined three hundred-thousand dollars.

121.    Next, the investigators asked Dr. Khan if any of Breen's patients came through Dr. Khan's office. Plaintiff certainly did not know the names of her patients and found that question bizarre and accusatory. At the given time Plaintiff had no idea if any of Janet Breen's patients had consulted with him. He did not know who Breen was, let alone the names of her patients.

122.    In response to their questioning about the Breen patients, Plaintiff asked back at them "I don't know – have they?" -  Plaintiff explicitly asked the investigators if they knew if her patients came through this office, since by their own queries, Plaintiff assumed they were following up on some information which was unknown to him. The investigators remained silent and they had no answer. If they did, they refused to provide one.

123.    The investigators then asked to walk through Dr. Khan's office and demanded that Dr. Khan show to them where Plaintiff kept the vaccines. Feeling coerced for the reasons articulated above, Plaintiff complied. The vaccines were all kept in compliant storage and the expired vials were separated from the current ones. Investigator Cruz commented that this was a

good thing.

124.   The investigators took photos of the vaccine storage areas and the visit of April 29, 2024 concluded. This constitutes an illegal search and seizure in violation of the Fourth Amendment. The investigators then departed Plaintiff's business premises without any further ado.

**(ii)    The continuous violation of Plaintiff's**
**Fifth and Fourteenth Amendment rights.**

125.   In general, Plaintiff has a property right in his license of which he cannot be deprived without due process. The due process right is a constitutional right protected by the Fourteenth Amendment of the US Constitution.

126.   The legislature empowered only the New York Board of Professional Medical ("BPMC") to discipline physicians under PHL Sec. 230. If after all the due process proceedings, formal hearings and formal determinations of the BPMC that agency determines that a physician committed professional misconduct, only the BPMC may impose the sanctions available to the BPMC under Public Health Law Sec. 230-a.

127.   Among the sanctions available to the BPMC to be imposed upon a physician's license is a license restriction. See PHL Sec. 230-a(3). A license restriction is a Limitation of the license to a specified area or type of practice".

127.   The wide array of due process protections, including notice and opportunity to be heard and the manner in which hearings are conducted by the BPMC as a predicate to imposing any discipline allowed by PHL Sec. 230-a. are set forth in PHL Sec. 230 and State Administrative Procedure Act Sec. 301 through 401.

128.   None of the defendants are authorized by statute to impose license disciplinary sanctions upon the Plaintiff or any other physician licensee in this state.

129.    Certainly none of the defendants named in this action have any authority to take any action against the Plaintiff without a hearing and opportunity to be heard without flagrantly violating Plaintiff's constitutional rights the Fourteenth Amendment.

130.    Nonetheless, as discussed below, that is exactly what the defendants in this case did. They simply restricted Plaintiff's access to the New York State Immunization Information System ("NYSIIS") by administrative fiat and without any warning, any notice or opportunity to be heard. That action in turn acts and continues to act as a license restriction against Plaintiff's ability to immunize his patients. The foregoing actions taken by the defendants in this case, as more particularly detailed below amount to Plaintiff's due process rights safeguarded by the Fourteenth Amendment.

131.    Even the statutes governing the limited powers of the Defendants to act with respect to any violations of PHL Sec. 2168 and 10 NYCRR Sec. 66-1.2 regarding vaccinations (none were ever identified or specified by the Defendants in this case) mandate that in case that such a violation occurs, notice an opportunity to be heard through formal hearings have to be given to the Plaintiff before any action is taken against him by the Commissioner. See PHL Sec. 12-a.

133.    No such procedure as specified in PHL 12-a(3) has been followed in this case. The reason could be simple, the Defendant investigator and the Bureau of immunizations simply do not have authority to restrict Plaintiff's license by administrative fiat.

134.    An explanation of the purpose and substance of PHL Sec. 2168 and 10 NYCRR Sec. 66-1.2 is now in order so as to keep matters in context.

135.    In 2006 the legislature enacted PHL Sec. 2168 thereby creating the New York State Immunization Information System ("NYSIIS"). In short, the NYSIIS is a centralized database system that keeps track of all immunization in New York.

136.    All healthcare providers who administer immunizations in New York have to register and enter all of the information provided both by statute and by the regulation 10 NYCRR Sec. 66-1.2 enacted pursuant to the same statute.

137.    The inability to enter information regarding immunizations in the NYSIIS database within the time limitation prescribed by 10 NYCRR Sec. 66-1.2 related to immunizations provided for persons under 19 years of age in effect acts as a bar against the health care provider's ability to practice medicine in an unrestricted manner and to provide vaccinations to his/her patients.

138.    In turn, such bar from accessing the NYSIIS is a de facto license restriction imposed without authority pursuant to PHL Sec. 230-a(3) by the defendants herein and without following the due process mandates of PHL Sec. 230. In fact the defendants cannot not follow and comply with the due process mandates of PHL 230 simply because they are not the BPMC which is the agency empowered by the legislature to impose license restrictions after compliance with the due process mandates co PHL Sec. 230- and State Administrative Procedure Code ("SAPA") Sec. 301 through 401.

139.    Moreover, the Plaintiff has a constitutional Fifth Amendment right to practice his profession without unreasonable interference from the state government. That right is subject to reasonable regulation from the proper state authorities empowered to impose disciplinary restrictions on Plaintiff's medical license, in this case the BPMC (PHL Sec. 230).

140.    Because Plaintiff's license was restricted by the defendants without authority and without due process, defendants' blocking Plaintiff's access to NYSIIS for the purposes of his compliance with PHL Sec. 2168 and 10 NYCRR Sec. 66-1.2 amounts to a violation of his Fifth and Fourteenth Amendment rights.

141.    Because the NYSIIS restriction is still ongoing, the violation is continuous and prospective in the context of a request for injunctive and declaratory relief.

143.    The facts related to this license restriction are recited hereafter.

144.    After defendants' first violation of Plaintiff's Fourth Amendment rights during the first unannounced in person entry and search by the investigators conducted on April 29, 2024, Plaintiff continued to provide various vaccinations for patients through the month of May and entered the data into the NYSIIS as required by law.

145.    At some point in mid-May, 2024, Plaintiff received a call from a mother whose child was vaccinated several months before the investigators' entry on Dr. Khan's business premises on April 29, 2024.

146.    With respect to this patient, Plaintiff had entered the vaccine info into NYSIIS as required by the applicable statutory and regulatory provision.  The mother of the patient told Dr. Khan that her general practitioner was trying to enter the same info into their system and it was 'rejecting' the info from Dr. Khan's record. It was also unclear as to why the information was rejected by the NYSIIS system.

147.    The mother informed Dr. Khan that the result of the system rejection of the information , the mother was told by the other practitioner that either her children would need to get re-vaccinated, or show proof of immunity by checking blood antibodies.

148.    Because the mother was not willing to risk re-vaccinating her children in that short a time frame, (she had vaccinated them at Dr. Khan's office a short time prior to the investigator's first entry) – the mother elected to have their blood drawn and both blood samples were submitted to a laboratory for testing.

149.    Test results reflected that both daughters showed signs of successful immunization

and were allowed to continue their school/camp.  According to the accepted theories of vaccination – considering the girls age – they could not have produced the anti-bodies without having been vaccinated.

150.    After the foregoing incident, at the beginning of June, 2024 Plaintiff vaccinated two children from a friend's family for meningitis.  When Plaintiff went to enter the vaccine information into NYSIIS – Plaintiff was unable to access the database.

151.    Plaintiff was simply obstructed and blocked June 3rd, 2024 and thereafter by the defendants from accessing the NYSIIS database. He was simply blocked from  complying with the entry of information of the NYS statute and regulations.  This shutdown was without any warning, notice of hearing and opportunity to respond to any findings and be heard.

152.    Dr. Khan  then contacted the NYSIIS help-desk on or about June 3, 2024. The unidentified representative told Dr. Khan that they would forward the query to the DOH.  A day or so later, Plaintiff called the DOH Bureau of Immunizations with whose telephone representatives the Plaintiff  had spoken to in the past (2020) with respect to procuring and documenting the COVID 19 vaccines.  Plaintiff left a message and received no response.

153.    Dr. Khan  became increasingly concerned about his being closed out of the NYSIIS by the Defendants because some of the patients whom the  Plaintiff  had vaccinated in the past were returning for their follow-up consultations and injections – and Plaintiff had already ordered the vaccines for their pending visits.

154.    Dr. Khan  had to cancel a consultation for TDaP vaccination due to defendants' obstruction and Plaintiff asked the patients to reschedule the week of the 18th of June, 2024.

155.     Shortly after Plaintiff received no response to this  inquiry from the Defendants' vaccination bureau  Plaintiff emailed the investigator Burwell on Jun 7th Friday 3:15. EX C hereto,

seeking an explanation for defendants' shut down of Dr. Khan's access to NYSIIS.

156.    There was no answer from the Defendants to Dr. Khan's inquiry regarding the summary restriction of Dr. Khan's ability to provide vaccines and the de facto restriction on Dr. Khan's license to practice medicine. Plaintiff never received any type of a notice of violation or hearing or determination preceding the NYSIIS access shutdown by administrative fiat.

157.    Subsequently, Plaintiff recalled the investigators left a card. Plaintiff then called Defendant Burwell on Tuesday Jun 11th, 2024 to further inquire about the administrative restriction imposed by the Defendants on Dr. Khan's license through their administrative exclusion / lockout of Dr. Khan's access to NYSIIS.

158.    Defendant Burwell picked up the phone. Plaintiff asked him if he received Dr. Khan's prior email – EX B hereto. Burwell responded that he was on vacation. Plaintiff then explained the situation briefly. Burwell said that he would investigate the situation and get back to him. As per his comment, Burwell was supposedly on vacation and would look into it for Dr Khan.

159.    Through the date of this Amended Verified Complaint, the defendants have still not restored access to NYSIIS for the Plaintiff and continue to violate his Fourteenth and Fifth Amendment rights through the foregoing unauthorized license restriction.

**(iii)    The second violation of Plaintiff' Fourth Amendment rights –
the entry and search of Dr. Khan's business premises on
<u>June 12, 2024.</u>**

160.    On Wednesday June 12, 2024, while Burwell was supposedly on vacation and one day after he made that misrepresentation to Dr. Khan, Defendants investigators Burwell and Cruz again appeared unannounced and uninvited at Dr. Khan's Syosset office at 11:30AM. Plaintiff assumed that they came to address Dr. Khan's inquiry about being locked out of NYSIIS.

161.   Dr. Khan did his best again to accommodate the "visit" while he had scheduled patients and the defendants were clearly harassing and interfering Plaintiff's ability to see his patients.

162.   Shortly, it  became clear to Dr. Khan that the defendants wanted further interrogation and had no intention in addressing his NYSIIS access shutdown from the system. Once they sat down,  the defendants  did not address the NYSIIS lock-out, except for the very end of the meeting, after more series of interrogation as described below.

163.   The defendants proceeded to cite  certain lapses/errors in Dr. Khan's NYSIIS documentation which were undocumented and non-descript and they asked Dr. Khan to respond to the accusations. Because Dr. Khan had no information as to what it was that the defendants were talking about without any specific information he was literally unable to answer defendants' questions.

164.   By defendants' own admission, they were bragging that they shut Plaintiff's NYSIIS access due to what they said that was a non-descript and nonspecific violation of the information data entered by the Plaintiff in NYSIIS without any hearing, opportunity to be heard and without any authority to impose a license restriction pursuant to PHL Sec. 230-a(3)

165.   At the initiation of Plaintiff's second interrogation by the defendants on June 12, 2024, Dr. Khan noticed  Defendant Burwell pressed a button on his phone screen – and Plaintiff suspected that he may have been  recording the meeting without Dr. Khan's permission and without a warrant or court order.

166.   Plaintiff once again felt coerced by an uninvited and unannounced "visit" coupled with what appeared to him to be an unauthorized recording of the same by Burwell. Once again

based upon his past interfaces with regulatory authorities, Plaintiff did not want to appear confrontational, since Plaintiff thought that the investigators were acting in good faith.

167.    Instead, of what he was accustomed to in the past, on June 12, 2014 Burwell started his conversation by asking Dr. Khan if Plaintiff knew that he had entered vaccines into NYSIIS whose lot numbers had expired.

168.    Of course Plaintiff did not recall doing that without any further information of dates, times, names of vaccines, names of patients and lot numbers which would have necessitated a spot check of the information by Dr. Khan.

169.  Burwell  then began outright  accusing Dr. Khan of some unspecified, unidentified and unknown vaccines which had expired lot numbers and were entered by Dr. Khan into the NYSIIS database.

170.    Once again, the investigator did not identify which vaccines those were, when they were purportedly entered into the NYSIIS, the name and identifying information of each patient to whom the alleged vaccines were administered and  which lot numbers expired before the vaccines  were administered.

171.    Dr. Khan  asked Burwell how many entries in the NYSIIS of the several hundred that Plaintiff entered over the last few years,  reflected that Plaintiff administered vaccines which had expired lot numbers.  Defendant Burwell refused to give any specifics of an answer to this legitimate query.

172.    Next, Defendant Burwell outright accused Dr. Khan of accepting consultations from patients whose home address is in California, Arizona and Pennsylvania – that came to see Dr. Khan at unspecified times and dates. Burwell failed to identify how seeing or consulting out

of state patients by Dr. Khan at Dr. Khan's New York offices amounted to any violation of the law.

173.    In fact like any other physician from New York of good reputation and a unique skill set, Plaintiff sees patients from all over the world and all over the United States. Patients have travelled from England, Dubai, India, Philippines, to see Dr. Khan.

174.    Plaintiff has provided virtual consultations for patients in Egypt and Pakistan. Within the USA – patients have travelled to consult with Dr. Khan from many states including Florida, Indiana, California, Arizona, Connecticut, Pennsylvania, Massachusetts, New Jersey.

175.    It is inexplicable, short of harassment how and why the investigators would investigate Dr. Khan for simply consulting and caring for out-of-state and international patients inside Dr. Khan's office in New York. Plaintiff suspects this was apparently part of defendants' profiling dragnet which wound up leading to a systematic pattern of the Plaintiff.

176.    Following that discussion, without giving any specific information, Burwell further accused Dr. Khan of having logged in an entry for a vaccination date which was 1.5 yrs. prior to the entry. Burwell then asked Dr. Khan if Plaintiff knew what the longest delay should be between an injection and logging it.  Plaintiff did not have an immediate answer without any specific information. The investigator volunteered that the maximum allowed delay was two weeks. The investigator failed to identify any specific information which supported this accusation, and Plaintiff had no idea and could not have ventured to even guess which entry the investigator was talking about.

177.    In addition, when again confronted with the inability to vaccinate patients due to access lockdown to NYSIIS , and when Dr. Khan informed the investigators  of a  pending order of vaccines due to arrive - investigator Cruz  denied any such restriction, and stated that Plaintiff

still had his license, so Plaintiff could vaccinate without restrictions notwithstanding the fact that Plaintiff just could not enter vaccination information into NYSIIS and mandated by New York law.

178.    In effect defendant investigator Cruz affirmatively encouraged Dr. Khan to continue to administer vaccines even though Plaintiff cannot report information related to the vaccines to the NYSIIS. That is a flagrant violation of the vaccine administration laws discussed above.

179.    A violation of any federal or state statute or regulation governing any aspect of Plaintiff's medicine, where such violation is adjudicated to exist amounts to professional misconduct under New York Education Law Sec. 6530(b)(3).

180.    Next, during the second entry effectuated by Cruz and Burwell on June 12, 2024. Defendant Cruz expressed suspicion because Plaintiff did not advertise vaccine services. That is quite puzzling.

181.    There is no such thing as an affirmative duty for a Dr. Khan to advertise that he vaccinates his patients.

182.    The New York professional advertisement laws pertaining to physicians do not mandate any specific services which have to be advertised. The Defendants failed to identify any provision of New York or federal law which mandates that a physician has an affirmative duty to advertise administration of vaccines as a service provided by the physician.

183.    Education Law Section 6530(27) which defines medical misconduct requires an actual overt act of advertising or soliciting which is not in the public interests in order for the advertisement to constitute medical misconduct.

184. Education Law Section 6530(27)(a) is specific in defining what overt acts of advertising amount to professional medical conduct which includes specific definition of advertising which amounts to professional misconduct as follows: (a) Advertising or soliciting not in the public interest shall include, but not be limited to, advertising or soliciting that: (i) is false, fraudulent, deceptive, misleading, sensational, or flamboyant; (ii) represents intimidation or undue pressure;(iii) uses testimonials; (iv) guarantees any service; (v) makes any claim relating to professional services or products or the costs or price therefor which cannot be substantiated by the licensee, who shall have the burden of proof; (vi) makes claims of professional superiority which cannot be substantiated by the licensee, who shall have the burden of proof; or (vii) offers bonuses or inducements in any form other than a discount or reduction in an established fee or price for a professional service or product.

185. There is no provision in Education Law Sec. 6530 which defines failure to advertise vaccinations as professional medical conduct or a violation of the law.

186. Clearly a state investigator Cruz , who  has no clue about what the pertinent statutory provisions regarding professional advertisement say, must not act as an attorney harassing a physician with questions which are false and make knowing misrepresentations of the law in hopes of tripping up Dr. Khan  into admitting that he was wrong about what he is not required to do in the first place.

187. Cruz's inquiry about advertisement practices which he made up and do not exist, violates the decisions of the Court of Appeals and the Appellate Divisions state wide which prohibit state officials from aimlessly inquiring into the business of a physician in hopes of finding violations of then law. These accusation  are unconstitutional  as they amount to an unreasonable

interference with Plaintiff's Fifth Amendment right to practice his vocation without unreasonable government interference.

188.   Finally, on their rising and way out of Dr. Khan's office on June 12, 2024, the Defendants Cruz and Burwell revealed that the NYSIIS lockout was because of what they disclosed to him in the above nonspecific and non-descript terms that their findings were. The investigators the handed Dr. Khan the subpoena dated June 11, 2024, which is one of the subject matters of this litigation. EX A hereto.

**(vi)   The third violation and prospective violation of Plaintiff's Fourth Amendment rights – the government subpoena EX A hereto violates the Fourth Amendment.**

189.   The subpoena dated June 11, 2024 (EX A hereto) is signed nonetheless by none other than Joseph Giovannetti,  a glorified investigator of the DOH who is the Director of the Investigations of the said department. He is also the supposedly a supervisor of defendants Cruz and Burwell. His "director of investigations" title does not make him anymore or any less than an investigator of the agency which is supposed to issue the subpoena in furtherance of a Commissioner's investigation.

190.   Much less does the  "director of investigations" title give defendant Giovannetti the right to violate Plaintiff's  Fourth Amendment rights and issue an unsupervised subpoena and hand it over to  his subordinates to pass it off as a legitimate and authorized official document to conduct a document search and seizure pursuant to the Fourth Amendment.

191.   Not only that defendant Giovannetti's issuance of a subpoena is a Fourth Amendment violation but the service of the same upon the Plaintiff by his subordinates was part of the systematic pattern of harassment actionable under 42 USC Sec. 1983.

192.    In fact Giovannetti took it upon himself not only to harass and threaten Dr. Khan through his subordinates as set forth above in this amended complaint.  When he learnt that he has been sued and received a copy of the initial complaint, Giovannetti continued his pattern of harassment of the Plaintiff by sending an unwarranted  threat to Dr. Khan's attorney  in an email actually addressed to Dr. Khan's attorney. Ex D hereto.

193.    Giovannetti, who is a defendant in the federal action, actually  told Dr. Khan's attorney in writing that the attorney should advise Dr. Khan regarding Giovannetti's accusation of destruction of medical records and threatened further prosecution without any evidence that such intended destruction has taken or will be taking place at any time. See email and Dr. Khan's counsel's response EX D hereto.

194.    It is astounding that the defendant Giovannetti actually continued his pattern of harassment after the commencement of this action knowing that his conduct will be scrutinized by this Court. His email is nothing short than proof of the actual nature of the interactions between the investigators and Dr. Khan which violated and continue to violate Dr. Khan's constitutional rights.

195.    Giovannetti's conduct in self executing and issuing a subpoena in violation of the Fourth Amendment and his continued threats directed at the Plaintiff after he became aware of the commencement of this litigation are a prime examples of the reason why the US Supreme Court held that to be valid under the Fourth Amendment a subpoena cannot be issued by an investigator and the decision to enter and inspect a business premises is not left to the unfettered discretion of the investigators.

196.    The Subpoena violates the Fourth Amendment for several reasons as discussed below:

46

(a)    It is issued by an investigator who has no powers to issue subpoenas without violating the Fourth Amendment;

(b)    The subpoena is not authorized by statute because it purports to seek documents related to diagnosis and treatment of patients which the defendants have no authority to collect;

(c)    The subpoena is broad and indefinite;

(d)    The subpoena seeks documents which are irrelevant to Plaintiff's vaccination practices;

(e)    The subpoena seeks materials and documents which can only be sought by the New York Board of Professional Medical Conduct under PHL Sec. 230(10)(k);

(f)    The subpoena seeks materials and medical documents related to the practice of complementary medicine which are safeguarded against investigations and prosecutions by the OPMC and BPMC under PHL Sec. 230(9-b) and Education Law Sec. 6527(4)(e).

(g)    The subpoena violates the time limitation provided by the legislature for response to the same (30 days from receipt of communication form the department of health) by arbitrarily shortening the response time from 30 days to 14 days at the discretion and pleasure of an investigator who has no authority to issue the subpoena in the first place.

**AS AND FOR A FIRST CAUSE OF ACTION FOR
AN ORDER PURSUAN TO 28 USC Sec. 2201 et.seq.
AND FED. R. CIV. PROC. 45 QUASHING AND
REVOKING STATE ADMINISTRATIVE SUBPOENA
<u>FOR FOURTH AMEDNMENT VIOLATIONS</u>**

196.    Plaintiff repeats reiterates and realleges each and every allegation set forth hereinabove with the same force and effect as of the same are fully set forth at length herein.

(i)     **In general – administrative subpoenas**.

197.     Federal and state jurisprudence and the Fourth Amendment govern demands for business/medical records.  Search regimes where no warrant is ever required are per se unconstitutional.

198.     A search regime may be reasonable where "'special needs ...make the warrant and probable-cause requirement impracticable. " and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control." The Courts referred to this kind of search as an "administrative search." Thus, the administrative search seeking business records in furtherance of an investigation conducted by the Commissioner of Health pursuant to Public health Law Sec. 206 falls within the administrative searches exception to the warrant requirement.

199.     Absent consent, exigent circumstances, or the like, for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain pre-compliance judicial review before a neutral decision maker.

200.     An administrative search may proceed with only a subpoena where the subpoenaed party is sufficiently protected by the opportunity to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in federal district court or any other court of competent jurisdiction.

201.     New York legislature affords a physician a period of thirty (30) days for a medical licensee to respond to communications from the Department of Health including response to subpoenas for relevant medical and business records. See Education Law Sec. 6530(28). There is no statute which vests any investigator of the Department of Health or anyone else for that matter with authority to shorten the thirty days statutory time limitation. Investigator Giovannetti did just that in the subpoena. EX A hereto.

48

202.    Enforcement and review  of administrative subpoenas has long been committed, not to administrative tribunals themselves, but instead to the courts. Power to enforce subpoenas ... is cast in this traditional mold, without limitation on the court's discretion to set terms ensuring that the enforcement order does not become an engine of oppression. Stated somewhat differently, judicial authority to temper enforcement with fairness sterns inexorably from congressional entrustment  of subpoena enforcement to the judiciary.

203.    Consequently this action challenging the subpoena EX A hereto pursuant to the Fourth Amendment was timely brought before this court with the filing of the original complaint an within the time limitations imposed by Education Law Sec. 6530(28).

**(ii)    The subpoena violates the Fourth Amendment because it
was issued by an investigator    with unfettered
discretion in making decisions on the issues of entry
and inspection and the content of the documents sought.**

204.    To be valid under the Fourth Amendment, the  subpoena cannot be issued by an investigator of the agency seeking to conduct the administrative search.

205.    In delineating the manner in which administrative searches are conducted by subpoena  the US Supreme Court stated in *See v. Seattle* 387 U.S. 541.543 (1967) that **the subpoena may not be made and enforced by the inspector in the field.**

206.    The US Supreme Court held that businessman, has the right to go about has business without being subjected to unreasonable searches and seizures. The Court held that the business man has his Fourth Amendment right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant.

207.    Federal jurisprudence holds that **the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer in the field. Given the**

49

**analogous investigative functions performed by the administrative subpoena and the demand for entry, the US Supreme Court finds untenable the proposition that the subpoena, which has been termed a "constructive" search, is subject to Fourth Amendment limitations which do not apply to actual searches and inspections of commercial premises.**

208.    In this case the subpoena violates the Fourth Amendment because it was signed and issued by Joseph Giovannetti – EX A, an investigator of the Department  Health who sports the title of Director of Investigations. The title does not divest Giovannetti of the actual function that he performs, which is a supervising investigator of the investigators Cruz and Burwell.

209.    There is no interim superior supervision exercised over Giovannetti's Cruz's and Burwell's  unfettered discretion to enter and inspect Dr. Khan's premises and demand record production  under the guise of the issued subpoena  by any separate officer of the Department of Health that is not involved directly with the investigators' decision to conduct the search and seizure of the documents specified in the subpoena.

201.    Defendants' reliance on PHL Sec. 206(4)(a) and PHL Sec. 12-a(1) authority for anointing investigators with subpoena issuing powers is similarly misplaced.

202.    At p. 4 of the subpoena, Giovannetti cited New York's Public health Law Sec. 206(4)(a) and an unspecified statute dubbed §12- as the authority for the issuance of the same by investigations director. EX A hereto.  There is no PHL Sec. 12-. There is however a PHL Sec, 12-a(1) which will be discussed below. Neither one of the foregoing  statutes can vest investigators with powers to use their discretion and issue subpoenas because such proposition violates the Fourth Amendment as discussed above and below.

203.    PHL Sec. 206(4)(c) on its face does not provide any authority for investigator Giovannetti to issue the subpoena. Instead, that statute speaks of the authority of the Commissioner

of Public Health to issue subpoenas in furtherance of investigations.

204.    Most importantly, because the decision to enter and inspect the premises or business records  of a licensee under the jurisdiction of the department of health cannot be left to the unfettered unsupervised decision of an investigator without violating the Fourth Amendment, neither one of the two statutory provisions mentioned above can vest any investigator to issue subpoenas whether glorified by the supervisory title of "Director of Investigations" or not.

205.    With the foregoing legal concepts in mind, the analysis regarding Plaintiff's application to quash subpoena now turns to the two statutes cited in the subpoena.

206.    A cursory review of the language of both statutes indicates that neither one of them on their face provide for such authority for an investigator of the department of Health to issue the subpoena.

207.    Had any of the two statutes on their face provided for authority to the Commissioner to delegate the powers to issue subpoenas to state investigators, the challenge of either one of the statutes launched by the Plaintiff would be a facial challenge (the statute violates the Fourth amendment on its face with respect to everyone and there is no circumstance under which the statute can be constitutional and saved under the Fourth amendment). However, the statutes do not provide any delegation powers to issue subpoenas specifically to state investigators at all. Nor do the statutes provide any specific powers for the investigators to issue subpoenas.

208.    The Court is directed to PHL Sec. 206(4)(a) cited as the source of the authority for the subpoena issued in this case at page 4 of the subpoena – EX A.

209.    That statute reads verbatim as follows:

4. The commissioner may:

(a) issue subpoenas, compel the attendance of witnesses and compel them to testify in any matter or proceeding before him, and may also require a witness to attend and give

51

testimony in a county where he resides or has a place of business without the payment of any fees.

210.    On its face, PHL Sec 206(4)(a) does not provide any authority or powers to either (a) the Commissioner to delegate the subpoena powers appearing in this statute to anyone including state investigators such as Defendant Giovannetti or (b) the investigator/director of investigations Giovannetti to morph into the commissioner and assume the subpoena issuing powers of this statute.

211.    Therefore on its face PHL Sec. 206(4)(c)  does not vest the investigators of the DOH with any powers or authority  to issue subpoenas. Nor does  PHL Sec. 206(4)(c)  on its face vest the commissioner with any powers to delegate the subpoena making power to the investigators.

212.    To the extent that the Defendant apply the provisions of PHL Sec 206(4)(a) to exert subpoena issuing powers, the statute is unconstitutional as applied and the plaintiff challenges the same below pursuant to the declaratory judgment relief sought in accordance with 28 USC Sec. 2201.

213.    Similarly, a cursory reading of PHL Sec. 12-a(1) discloses that the statute on its face does not provide investigator Giovannetti or any investigator or director of investigations of the Department of Health to issue subpoenas.

214.    Sec. 12-a(1) reads verbatim as follows:

1. The commissioner, **or any person designated by him for this purpose**, may issue subpoenas and administer oaths in connection with any hearing or investigation under or pursuant to this chapter, and it shall be the duty of the commissioner and any persons designated by him for such purpose to issue subpoenas at the request of and upon behalf of the Defendant.

215.    Clearly, this statute on its face does not provide the investigator Giovannetti, or any

52

other investigator of the Health Department whether glorified in title or not, to issue any subpoenas.

216.    The statute also on its face does not vest the Commissioner with powers to flagrantly violate the Fourth Amendment by delegating subpoena issuing powers to Department of Health investigators. Therefore, defendants' evident reading of the language " **any person designated by him for this purpose"** to include stat investigators, is unconstitutional as applied because it violates the Fourth Amendment.

217.    Had the statute provided the Commissioner with specific powers to delegate the subpoena making powers to state investigators it would be facially unconstitutional and violative of the Fourth Amendment for the reasons articulated hereinabove.

218.    To the extent that the Defendants are applying PHL Sec. 12-a(1) to the facts of this case in order to facilitate the issuance of a subpoena to Dr. Khan by state investigators, the statute is unconstitutional as applied and violative of the Fourth Amendment.

219.    It is irrelevant that the Defendants failed to attach any delegation of subpoena powers by the Commissioner to Defendant Giovannetti. Even if such designation did exist a delegation of the subpoena issuing powers to the director of investigations by the Commissioner, is violative of the Fourth Amendment for all of the reasons articulated above and below.

220.    The subpoena was  issued at the discretion and pleasure  of the head investigator of the Department of Health who has no authority under the Fourth Amendment to issue subpoenas and to exercise discretion in what documents to seek and investigate. Furthermore, the investigator is  exercising unfettered discretion as to entry and inspection issues in further violation of the Fourth Amendment. There is no supervision over the investigators similar to a  warrant procedure.

221.    A good illustration of an existing analogous supervisory system of the subpoena

issuance powers in investigations related to professional medical conduct is PHL Sec. 230(10)(k).

222.   The New York Board of Professional Medical Conduct ("BPMC") is vested by statute with powers to investigate medical conduct. See PHL Sec. 230.

223.   Similar to the investigators in this case, the Office of Professional Medical Conduct, and specifically the Director of the OPMC is responsible for the investigative stages of professional medical conduct. See PHL Sec. 230.

224.   However, when it comes to issuing subpoenas, neither the OPMC director, who is in part the equivalent of defendant Giovannetti in the investigative stage for which the OPMC is responsible, nor any other investigators are authorized to issue subpoenas.

225.   Unlike PHL Sec. 12-a(1) allowing for delegation of the subpoena powers to any person of the Commissioner's choosing without specification, in the case of BPMC investigations, a separate official who is not associated with the investigative body, which is the OPMC, oversees the subpoena issuance process. That person is the executive director of the BPMC. The BPMC the actual investigating body who oversees the investigation of professional medical conduct. See PHL Sec. 230(10)(k)

226.   Even the executive director of the BPMC does not have the authority to issue the subpoenas alone. He/she is being supervised by an investigative committee of the BPMC who has to consent to the issuance of the subpoena after considering the facts placed before them, much like a judge or a magistrate does in cases of warrant issuance. See PHL Sec. 230(10)(k).

227.   Only after obtaining the consent of the BPMC investigative committee can the executive director himself/herself issue a subpoena.

228.   In cases where the executive director sought to delegate the subpoena making power to BPMC counsels or other officers who are not the executive director himself, and where

such subpoenas were issued by anyone other than the BPMC director with an attached "delegation" of such subpoena making powers, the courts simply struck down such subpoenas as invalid. See e.g. *Patel v. Bassett*, Index No. 154347/2022 – EX E hereto.

229.    In the present case, there are no Fourth Amendment protections in place to prevent the issuance of subpoenas by investigators in violation of the Fourth Amendment. There is no one between the investigators and the Plaintiff overseeing the decisions of the investigators to enter and inspect his premises and to further oversee the issuance of subpoenas at the request of the investigators. There is no buffer such as the administrative equivalent of a judge  the overzealous defendants Giovannetti, Cruz and Burwell and the Plaintiff in the subpoena issuance process.

230.    For all of the above referenced reasons, the subpoena should be quashed and stricken.  The subpoena  was issued by an unsupervised investigator, at the discretion of the investigator and it is without the equivalent  authority of a warrant. In short, the subpoena on its face violates the Fourth amendment because it is issued by an investigator of the Health department.

   (iii)    **The subpoena violates the Fourth Amendment because <u>defies and fails the reasonableness test on several levels.</u>**

   (a)    <u>**In general.**</u>

231.    The US Supreme Court recognized that while the statutory powers of regulatory agencies to investigate have traditionally been extensive, "the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

232.    So long as the investigation was for a lawfully authorized purpose, the documents sought were relevant to the inquiry, and the demand was reasonable, the Administrator had a right

to judicial enforcement of the subpoenas. However, the administrative agency **may not act arbitrarily or in excess of its jurisdiction.**

233.    The courts   recognized that there are limits on the investigative powers of administrative agencies where a governmental investigation into the affairs of a business may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power.

234.    It is now settled that, when an administrative agency subpoenas records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

235.    The agency has the right to conduct all reasonable inspections of such documents **which are contemplated by statute**, but it must delimit the confines of a search by designating the needed documents in a formal subpoena.

236.    It is these rather minimal limitations on administrative action which the courts delineated that are constitutionally required in the case of investigative entry upon commercial establishments. The agency's particular demand for access will of course be measured, in terms of probable cause to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved.

237.    The Fourth Amendment is not confined to actions by the police but extends as well to administrative agencies whose purposes are other than the investigation or detection of criminal law violations. While the traditional criminal law quantum of probable cause -- that a crime has been committed and that evidence, fruits or instrumentalities of that crime may be found in a particular place -- may not apply to such administrative agencies, they must still demonstrate the

reasonableness of and necessity for the search. One reason for this requirement is to guard against otherwise **unbridled "discretion to invade private property"**.

238.    In this case, the Fourth amendment applies to the state investigators, defendants Cruz, Burwell  and Giovannetti and their actions are being challenged as an unbridled, unhinged and unfettered  exercise of abusive discretion to invade private property and violate Plaintiff's Fourth Amendment rights.

239.    New York state jurisprudence follows federal jurisprudence in reviewing administrative searches.

240.    The general rule is that an investigative subpoena will not be upheld unless sufficient facts are shown to justify the inquiry.

241.    The general standard for determining the validity of a nonjudicial "office" subpoena is well established. An agency of the government may conduct an inquiry into the affairs of those within its jurisdiction only if it can establish "(l) **its authority for engaging in such an investigation and issuing the subpoena**; (2) that the evidence sought is reasonably related to the subject of inquiry; and (3) that there is an authentic factual basis to warrant the particular investigation".

240.    In the present case the subpoena on its face is not authorized by statute because it seeks medical records for the purposes of investigating medical conduct which fall squarely within the jurisdiction of the BPMC and not that of the defendants herein. See subpoena EX A item No. 2.

241.    The subpoena is also unauthorized by statute because it seeks documents which the investigators know and should have known that do not exist in item No. 4. This request is made for the purposes of harassing the Plaintiff. In particular the subpoena seeks documents item No. 4

which target the Plaintiff for practicing complementary medicine and nothing more. Had the defendants been the OPMC, which they are not, they would have known that the practice of complementary medicine in this state (dubbed as "non-conventional" in the relevant statutes) is protected against investigations and prosecution respectively by PHL Sec. 230(9-b) and Education law Sec. 6527(4)(e).

242.    In this case the Plaintiff is challenging the subpoena on multiple levels based upon the following grounds: (1) there is no authority for investigator Giovannetti to issue the subpoena; (2) the decision to enter the Plaintiff's premises and demand business records is left unchecked to the unfettered discretion of the investigators of the Vaccine Complaint Investigations Unit; (3) the investigation was prompted and driven by an admitted impermissible  unfettered inquiry into Plaintiff's business based upon information obtained from NYSIIS by the investigators and driven by illegal and abusive questioning of the Plaintiff by the investigators, in hopes of finding violations of the law. Those actions are prohibited under New York law by the New York Court of Appeals; (4) the subpoena violates the minimum thirty days mandate of Education Law .

243.    Administrative subpoenas stand on different footing than civil subpoenas duces tecum in New York. Public agencies do not have carte blanche in issuing investigative subpoenas. A witness subject to such a "nonjudicial" or "office" subpoena may always challenge the subpoena on the ground that it calls for irrelevant or immaterial documents or subjects the witness to harassment. That is what the Plaintiff is doing in this case.

244.    When a nonjudicial subpoena is challenged  claiming the materials  sought are irrelevant,  **it is incumbent upon the issuer to come forward with a 'factual basis' which establishes  the relevancy of the items sought to the subject matter of the investigation before a witness will be compelled to comply with the subpoena's mandate**".

245.    The issuer must demonstrate that the materials sought have "a reasonable relation to the subject matter under investigation and to the public purpose to be achieved" and that the investigation is not a fishing expedition aimed at harassing the Plaintiff.

**(b)    The subpoena violates the Fourth Amendment because it is not narrow, it is oppressive, overbroad, seeks documents which are which are not authorized by statute or are irrelevant to the scope of the investigation and it is used as a means of harassment <u>by the Defendants.</u>**

246.    To be compliant with a Fourth Amendment a government subpoena must be narrow and specifically tailored to obtain materials relevant to the investigation and authorized by statute. The present subpoena totally fails the Fourth Amendment reasonableness test as articulated herein. Specifically the subpoena is overbroad and harassing, it is seeking documents which are not authorized by the statutes under which these defendants operate in this case, and it is seeking irrelevant documents.

247.    Rather than defining the scope of the investigation and the conduct being investigated, this subpoena is nothing less than an impermissible fishing expedition in aid of a prohibited harassment investigation into Plaintiff's business practices in hopes of finding violations of the law.

248.    The Plaintiff has been targeted and profiled by the investigators simply because he practices complementary medicine and because patients seek him out to minimize vaccine injuries and vaccine adverse effects through the application of complementary medicine modalities (not through the replacement of conventional vaccines).

249.    A search or seizure within the Fourth Amendment occurs when the state either "physically occupie[s] private property for the purpose of obtaining information or invades a constitutionally protected privacy interest to gather information.

250.    That already occurred here twice; once on April 29, 2024 the other on June 12, 2024 as set forth above. Investigators Cruz and Burwell executed a warrantless search and seizure twice during their announced visits at Plaintiff's offices for the purposes of obtaining information. In both instances the "visit" was neither a true "visit" nor was it accompanied by a subpoena nor was it accompanied by a warrant.

251.    When the investigators finally prepared and issued and served the subpoena in question on June 12, 2024, they managed to flagrantly violate and continue to violate the reasonableness test of the Fourth Amendment and miserably failed the same.

252.    In order to meet the narrowness test of the Fourth Amendment, the things required by the subpoena cannot be excessively indefinite or overboard. When an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.

253.    The present subpoena utterly fails the foregoing reasonableness test. In item No. 1 the Defendants are seeking the production of the following: "any and all forms, purchase orders, confirmations, invoices, bills, receipts, shipping notices, packing slips and other records related to *the ordering, purchasing, shipping, receipt and return of any and all of the following vaccines from* January 1 to present": [there are 23 specific vaccines identified at pp 2-3 of the subpoena]. The Defendants content in footnote 1 at p. 1 that the names of the vaccines were obtained from information input belonging to Dr. Khan in the NYSIIS form January 2019 to present.

254.    This demand is seeking information that no statute or regulation mandates that the Defendant keep in his business records.  In addition, in order to verify the dates and information regarding these vaccines and associate them with specific time periods and patients to whom the

vaccines were administered, Dr. Khan needs access to the same information supposedly used by the investigators namely the NYSIIS system. The Defendant made that impossible by closing Dr. Khan out of the NYSIIS without any notice or hearing and opportunity to be heard.

255.    Specifically, Part 66 of the regulations of the Department of Health (10 NYCRR) is titled immunizations. It has all of the regulations pertaining to the NYS immunization program. None of those mandate the safekeeping over a period of five years or over any period of any of the documents requested by the Defendants in Item No. 1 of the subpoena.

256.    In addition, the Department of Education has its own regulations at 8 NYCRR Part 60 regarding the practice of medicine. None of those regulations impose any obligation to maintain any of the documentation demanded in item #1 of the subpoena.

257.    Therefore the documents demanded in item #1 are not contemplated by statute nor are they authorized by any relevant provision of the New York law.

258.    Turning to the relevant statutory schemes, Education Law Article 131 and 131A pertain to the regulation of the practice of medicine and definitions of professional misconduct. None of the statutes contained in these articles impose a duty on any physician to retain and make available for inspection any of the documentation requested in item #1 of the subpoena.

259.    Turning now to the Public Health Law Provisions. Starting with PHL Sec.2168, which is the statute establishing and providing for the statewide immunization information system – NYSIIS – none of the provisions of that statute mandates that purchase orders and receipts of the vaccinations have to be made available to state investigators upon demand. None of those provisions prescribe a mandate for the safekeeping of receipts of the procurement and payment or any documentation demanded in item No. 1 of the subpoena.

260.    Public Health law Sec. 206(1)(l) provides that the Commissioner shall: (l) establish

and operate such adult and child immunization programs as are necessary to prevent or minimize the spread of disease and to protect the public health. Such programs may include the purchase and distribution of vaccines to providers and municipalities, the operation of public immunization programs, quality assurance for immunization related activities and other immunization related activities. The commissioner may promulgate such regulations as are necessary for the implementation of this paragraph. Nothing in this paragraph shall authorize mandatory immunization of adults or children, except as provided in sections twenty-one hundred sixty-four and twenty-one hundred sixty-five of this chapter.

261.    The foregoing statute relevant to the Commissioner's establishment of child immunization programs says nothing about the retention by licensed physicians of any of the any of the documents requested by the investigators in item #1 of the subpoena.

263.    In short, the Commissioner's powers set forth in PHL Sec. 206 are broad and extend only to violations of the provisions of the New York Public Health Law as in this case, it relates to the administration and reporting of vaccines.

264.    Neither the Commissioner nor the investigators have the authority or the power to request that a licensed physician produce documents which neither the statutes nor the vaccine administration regulations mandate that the physician retain and produce at any time, let alone for a time spanning over more than five years from January 2019 through this date.

265.    In Item No. 2 of the subpoena the Defendants are asking for the production of all immunization records by Faiz Khan and/or Advanced medicine of Long Island of the twenty two individuals whose names and dates of birth are in Addendum 1 (addendum omitted for confidential information protection). See EX A. This item standing in and onto itself is not objectionable to the extent that the immunization records must match the information posted in. NYSIIS. However this

is not all the defendants are asking for in this item.

266.    In addition, to immunization records the investigating Defendants are requesting complete medical records which have no relevancy to the apparent issues being investigated related to vaccination reporting to the NYSIIS. The defendants are not authorized by any statute governing their powers and subject matter jurisdiction to request complete medical records of the 22 patients simply because, as they state in the footnote at page 3, "Dr Faiz Khan" reported to NYSIIS information regarding treatment of each of the individuals listed".

267.    Specifically in item #2, the responders demand full disclosure of "medical/clinical records (also known as "charts"); appointments/scheduling records; billing records and communication correspondence and/or notes and any other records of communication from, to with or on…. Of the individuals and/or the individuals guardians healthcare proxy.". In support of this request the Defendants sate that Faiz Khan reported to NYSIIS information regarding treatment of each of the individuals listed. The subpoena demands "any and all records" related to the treatment she reported."

268.    It is unknown what the Defendants contend that Dr. Khan reported as they are making compliance with this request impossible by blocking him access to the NYSIIS as set forth above. If the Defendants contend that they are investigating information entered by the Plaintiff in NYSIIS pertaining to medical treatments and communications with his patients regarding the same and that the Vaccine Complaint Investigation Team investigators are entitled to investigate medical conduct matters which do not involve the vaccine information mandated by the NYSIIS statutes and regulation, they are incorrect and the subpoena is overbroad, irrelevant and without authority.

267.    Medical conduct investigations related to medical treatment and diagnosis of any

63

patient is not within the subject matter jurisdiction of the Vaccine Complaint Investigation Unit. Rather, as set forth above, medical conduct investigations are exclusively relegated to the New York Office of Professional Medical Conduct and to the New York Board of Professional Medical Conduct as set forth in PHL Sec. 230.

268.    This is not an investigation conducted pursuant to PHL Sec. 230 by the statutorily empowered sub agencies of the Department of Health that have jurisdiction over professional medical conduct investigation.

267.    Rather this is a clear attempt by the Defendant investigators to "conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered,  by using the instant administrative subpoena without authority, relevancy, and some basis for inquisitorial action". Such conduct is prohibited both by the Fourth Amendment and by New York substantive law.

268.    As the New York Court of Appeals stated, [it] is ancient law that no agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered, especially with respect to subpoenas duces tecum. There must be authority, relevancy, and some basis for inquisitorial action".

269.    In this case, the general Vaccine Complaint Unit of the Department of Health has zero authority to investigate treatments and communications between Dr. Khan and his patients regarding their medical conditions and treatments which are unrelated to vaccine reporting. That is a matter relegated exclusively to the New York Board of Professional Medical Conduct. See PHL Sec. 230.

270.    This is not an investigation conducted by the OPMC on behalf of the BPMC. This

64

is an investigation conducted by the Vaccine Complaint Unit focusing apparently on reporting information contained in the NYSIIS. EX A. The confines of the subject matter of the reporting of immunizations to the NYSIIS are specifically delineated in Public Health Law Sec. PHL Sec. 2168 and 10 NYCRR Sec. 66-1.2. They do not include information sought in item #2 of the subpoena.

280.    Consequently, the materials and documents demanded in item No. 2 of the subpoena are irrelevant to the purported and otherwise undefined subject matter of the investigation which is apparently limited to verifying the correct immunization information entered into NYSIIS by Dr. Kahn as required by 10 NYCRR Sec. 66-1.2.

281.    Item # 3 of the subpoena demands "any and all records related to documenting the practice of charging patients for procurement cost of a vaccine and the subsequent division of that cost among future…(unreadable) who receive vaccines from the same vaccine supply concluding but not limited to …. records of cost divisions and calculations of costs, reimbursements, and any and all communications regarding cost variations and reimbursements.".

282.    This demand is nothing short than harassment. Dr. Khan, as the investigators know has a private pay practice and he does not take insurance. The cost of procuring and administering a vaccine is not prescribed or proscribed by any regulation of the Department of Health. The Department of Health Vaccine Complaint Investigations team neither regulates nor polices private pay fees.

283.    In short, the demand in item #3 is without any authority and it is irrelevant to investigating information which the Plaintiff is mandated to enter into NYSIIS by 10 NYCRR Sec. 66-1.2.

284.    Item #4 demands "any and all pamphlets, handouts guidance documents, informational sheets, and ----ions distributed to any and all patients regarding **homeopathic**

65

**alternatives to conventional vaccines**."

285.    This demand is directly aimed at knowingly  harassing and targeting the Plaintiff for practicing complementary medicine. This demand is without statutory authority for the following reasons:

(a)    the defendants do not have the subject matter jurisdiction or the powers to investigate medical conduct which involves the practice of complementary medicine. Professional medical conduct investigations are exclusively relegated to the BPMC and the OPMC by the legislature as set froth in PHL Sec. 230. These investigators and the Bureau of Immunizations head officers are not members of the OPMC or the BPMC and their cadre.

(b)    Even if the defendants were part of the BPMC or the OPMC, which they are not, both the investigation of Plaintiff's distribution of any information related to complementary medicine including "homeopathic" alternatives to conventional vaccines are protected by such intrusive harassment investigation by the provisions of PHL Sec. 230(9-b) and Education law Sec. 6527(4)(e) as well as by the First Amendment.

(c)    The statutes which empower the defendants to investigate vaccine reporting information in NYSIIS are not one and the same as the statutes governing the powers and subject matter jurisdiction to investigate the use of complementary medicine modalities vested in the BPOMC and OPMC and do not provide for authority to obtain communications protected by the First Amendment regarding complementary medicine vaccine alternatives.

(d)    The defendant know and should have known that the Plaintiff does not possess any such documentation because during the investigation he specifically stated the scope of his practice which relates to vaccinations is limited to the treatment and prevention of vaccine adverse reactions and vaccine injuries through the application of complementary medicine protocols. The defendant

know and should have known that there is no such thing as homeopathic alternatives to conventional vaccinations and even if there was such thing, this is not what the Plaintiff does in his practice. This demand was made for the purposes of harassment and nothing else.

287.    Item Number 5 demands the records of Plaintiff's past and present employees of the Plaintiff and their specific identification by name, date of birth and last known contact, address and telephone number. The language of the subpoena demands the foregoing information related to "any and all individuals employed by Faiz Khan and/ or Advanced Medical Long Island at any time and for any duration of time from January 1, 2019 to present." EX A.

288.    This demand is without any authority. The identity of Plaintiff's employees, and the particulars sought in this demand signals defendants' pursuit of further harassment of the Plaintiff and the harming of his business for no stated or unknown reason. It has nothing to do with vaccine reporting under NYSIIS system and everything to do with Defendants impermissible fishing expedition conducted into Plaintiff's general business affairs in hopes of finding violations of the law, as prohibited by New York Jurisprudence.

289.    In short, the subpoena violates the Fourth Amendment reasonableness test on many levels as described above. It is not issued pursuant to any statutory authorization; it is indefinite and oppressive and amounts nothing more than the use of the compulsory subpoena powers as a means of harassment and fishing expedition.

### AS AND FOR A SECOND CAUSE OF ACTION – MANDATORY TEMPORARY INJUNCTION PURSUANT TO FED. R. CIV. PROC 65.

290.    The Plaintiff repeats reiterates and realleges each and every allegation set forth hereinabove with the same force and effect as if the same is set forth at length herein.

291.    The Plaintiff requests the issuance of a mandatory temporary injunction pursuant

to Fed. R. Civ. Proc 65 mandating that the defendants immediately reinstate Plaintiff's access to NYSIIS because the defendant's administrative lock out of the Plaintiff from the NYSIIS amounts to a de facto license restriction without authority in violation of Plaintiff's Fourteenth Amendment guaranteed due process rights.

**(i)    In general – standard for issuance of mandatory injunction .**

292.    Courts in the Second Circuit refer to preliminary injunctions as prohibitory or mandatory. Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it. A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.

293.    Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing "a clear or substantial likelihood of success on the merits.".

**(ii)    The grounds based upon which the Plaintiff is seeking a mandatory injunction and the substance of the injunctive relief sought.**

294.    The Plaintiff is seeking a mandatory temporary injunction pursuant to Fed R. Civ. Proc. 65 directing the defendants, their agents, servants and assigns to immediately reinstate Plaintiff's access to the NYSIIS system for the purposes of terminating the continued violation of his Fourteenth Amendment due process rights and lifting the unauthorized, unconstitutional and illegal license restriction which was imposed upon Plaintiff's license by the defendants without authority and due process.

295.    As set forth above, in addition to subjecting the Plaintiff to repeated Fourth, Fifth

and Fourteenth violations and to continued harassment with intent of ruining Plaintiff's business, the Defendants took it upon themselves to compound their multiple constitutional violations by adding one more to the count. Judging by their own conduct, the unconstitutional searches and seizures of April 29, 2024 and June 11, 2024 and Director Giovannetti's own attitude reflecting a belief that the defendants are above the law – see EX D hereto, the defendants must have thought, "what is another constitutional violation between friends, no one is going to challenge us".

296.    Specifically, as already discussed above, the Defendants went so far to proceed by administrative fiat, to summarily and without notice opportunity to be heard and without holding a formal hearing to impose a license restriction upon Plaintiff's license by simply excluding him and locking him out of the NYSIIS central vaccination reporting system and thus preventing him from administering vaccines to his patients.

297.    The Defendants in this case imposed such license restriction while completely ignoring and bypassing the due process steps of PHL Sec. 230 and the State Administrative Procedure Act Sec. 301 through 401 which include, notice, formal hearings and formal determinations o the Board of Professional Medical Conduct finding and sustaining charges of professional misconduct as defined by Education Law Sec. 6530.

298.    In addition, neither the Bureau of Immunizations nor the investigative agents have any powers or authority to impose disciplinary restrictions on Plaintiff's license. That authority is strictly relegated to the BPMC and if appealed to the Administrative review Board of the BPMC.

299.    Defendants' actions of locking out the Plaintiff from the NYSIIS system without notice and opportunity to be heard and while refusing to explain their conduct amounts to a violation of due process under the Fourteenth Amendment, an act outside the scope of the powers and subject matter jurisdiction of the Defendants and an act which flagrantly violates the due

process protections of PHL Sec. 230 and SAPA Sec. 301 through 401.

300.    The Plaintiff has a Fifth and Fourteenth Amendment constitutionally protected right to practice his vocation without unreasonable government interference.

301.    Defendants' exclusion of the Plaintiff from access to NYSIIS and the imposition of a restriction in his license without due process amounts to an unreasonable government interference in violation of Plaintiff's Fifth and Fourteenth Amendment rights.

**(iii)    Irreparable harm – violation of constitutional rights.**

302.    Federal courts in this jurisdiction defined and addressed the existence of the element of irreparable harm where violation of constitutional rights is alleged. An alleged violation of a constitutional right "triggers a finding of irreparable harm".

304.    A  party applying for a preliminary injunction satisfies the requirement to show irreparable harm by alleging violations of constitutional rights. A court will presume that a movant has established irreparable harm in the absence of injunctive relief if the movant's claim involves the alleged deprivation of a constitutional right. When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary

305.    The alleged violation of a constitutional right triggers a finding of irreparable injury. Because violations of constitutional rights are presumed irreparable, the very nature of such allegations" satisfies the requirement that it show irreparable injury.

306.    With respect to defendants' imposition of a license restriction upon Plaintiff's medical license and his right to practice medicine in New York free of restrictions, the Plaintiff states that defendants' continued administrative blocking of access to the NYSIIS central database system amounts to a de facto license restriction which the defendants are not authorized to impose. The defendants imposed such restriction without affording the Plaintiff the minimum due process

procedures safeguarded by the Fourteenth Amendment and by PHL Sec. 230 and SAPA Secs. 301 through 401.

307.    In addition, the Plaintiff states that the foregoing license restriction imposed by administrative fiat without due process  amounts to an unreasonable government interference with Plaintiff's right to practice medicine free of the same in violation of the Fifth and Fourteenth Amendment.

308.    Although more constitutional violations do exist with respect to Plaintiff's application for a temporary prohibitive injunction as set forth above and below, the Plaintiff has shown that violations of the Fourteenth and Fifth Amendment exist due to defendants' imposition of a de facto license restriction through administrative summary access restriction to the NYSIIS.

309.    For all of the foregoing reasons, the Plaintiff has shown that a continued violation of his Fourteenth and Fifth Amendment rights exist as long as the defendants restrict his right to access the NYSIIS.

     **(iv)**    **The Plaintiff has shown a strong likelihood of
success on the merits to warrant the issuance
of a mandatory preliminary injunction.**

310.    As set forth above, the Plaintiff has made a strong showing of likelihood of success on the merits regarding his application for a mandatory injunction.

311.    Specifically, Plaintiff  has shown that the defendants imposed a de facto license restriction upon his medical license without authority and without any due process by using administrative fiat and blocking his access to NYSIIS.

312.    A restriction of access to the NYSIIS has the net effect of imposing a license restriction upon Plaintiff's license to practice medicine pursuant to PHL Sec. 230-a(3). Only the BPMC can impose such restrictions and only after the application of the full array of due process

procedures specified in PHL Sec. 230 and SAPA Sec. 301 through 401.

313.    In addition to having no authority to impose license restrictions on Plaintiff's medical license, the defendants herein are knowingly and willfully continuing to violate Plaintiff's due process rights by maintaining such restriction without an order from the BPMC and without affording the Plaintiff his due process rights to notice and opportunity to be heard at a meaningful time and in a meaningful manner. Such conduct clearly violates the Fourteenth Amendment.

314.    Even the statutes governing the limited powers of the Defendants to act with respect to any violations of PHL Sec. 2168 and 10 NYCRR Sec. 66-1.2 (none were ever identified or specified by the Defendants in this case) mandate that in case that such a violation occurs, notice an opportunity to be heard through formal hearings have to be given to the Plaintiff before any action is taken against him by the Commissioner. See PHL Sec. 12-a.

315.    No such procedure as specified in PHL 12-a(3) has been followed in this case. The reason could be simple, the Defendant investigators and the Bureau of immunizations simply do not have authority to restrict Plaintiff's license by administrative fiat.

316.    In addition, the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment."

317.    The due process clause of the Fifth and Fourteenth Amendment provides people with a constitutional "right to pursue an occupation" free of unreasonable government interference.

318.    Defendants' use of administrative fiat to deny Plaintiff's right to access NYSIIS which in turn amounts to a de facto license restriction is an unreasonable government interference which continues to violate Plaintiff's Fifth and Fourteenth Amendment rights.

319.    For all of the foregoing reasons the Plaintiff has made a strong showing of a likelihood of success on the merits of his application for a mandatory injunction against the defendants directing them to reinstate his access to NYSIIS.

**(v)    Balance of equities and public interest militate in favor of the issuance of a mandatory preliminary injunction.**

320.    The balance of equities and public interest favor a preliminary injunction here because there is a public interest in avoiding violations of constitutional rights.

321.    For all of the foregoing reasons the Plaintiff requests that a mandatory injunction issue directing the defendants, their servants agents and assigns to reinstate Plaintiff's access to NYSIIS and to terminate their conduct which continues to violate Plaintiff's Fifth and Fourteenth Amendment rights as set forth above in this Cause of Action.


**AS AND FOR A THIRD CAUSE OF ACTION –
PROHIBITIVE PRELIMINARY INJUNCTION
PURSUANT TO FED. R. CIV. PROC. 65.**


322.    Plaintiff repeats, reiterates and realleges each and every allegations set forth above with the same force and effect as if the same was set forth at length herein.

323.    The Plaintiff is seeking the issuance of a prohibitive preliminary injunction, preliminarily enjoining the defendants, their servants, agents and assigns from doing or causing to be done any and all of the acts recited in paragraphs 19 through 22 inclusive hereinabove and incorporated by reference herein.

**(i)    Showing of the element of irreparable harm – violation of constitutional rights.**

324.    In support of this application the Plaintiff has shown the existence of irreparable harm caused by defendants' continuous and prospective violation of Plaintiff's constitutional First,

Fourth, Fifth and Fourteenth Amendment rights.

325.    The Plaintiff has shown that the defendants are violating and continue to violate his First and Fourteenth Amendment rights by targeting him  through their subpoena request demanding materials and communications related to his practice of complementary medicine which are otherwise  protected by the First Amendment as well as by the provisions of New York PHL Sec. 230(9-b) and Education law sec. 6527(4)(e).

326.    In the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech

327.    In the present case the Plaintiff has shown both the likelihood of success on the merits as well as the existence of a serious question to require litigation, namely, defendants' use of the New York vaccine investigative process to violate Plaintiff First Amendment free speech rights and to stifle his right to freely impart medical information regarding the serious health and death risks of COVID 19 vaccines, the benefits of complementary medicine modalities to counterbalance the adverse effects of vaccines and reduce the risk of the same.

328.    They have demanded in item #2 the production of medical records which are outside of immunization charts and which can only be sought by the BPMC in order to conduct an unlimited unauthorized inquiry into Plaintiff's medical treatment modalities and information discussed with his patients.

329.    While using the  investigative process to stifle plaintiff's First Amendment rights as discussed above, the defendants also violated and continue to violate Plaintiff's Fourth, Fifth and Fourteenth Amendment rights as set forth above.

330.    Federal courts recognize that an integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients. That need has been recognized by the courts through the application of the common law doctor-patient privilege.

331.    The doctor-patient privilege reflects "the imperative need for confidence and trust" inherent in the doctor-patient relationship and recognizes   that "a physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."

332.    The US Supreme Court has recognized that physician speech is entitled to First Amendment protection because of the significance of the doctor-patient relationship.

333.    Being a member of a regulated profession does not, result in a surrender of First Amendment rights.

334.    To the contrary, professional speech may be entitled to "the strongest protection our Constitution has to offer." Even commercial speech by professionals is entitled to First Amendment protection.

335.    Because a doctor's recommendation does not itself constitute illegal conduct, the issuance of an injunction barring the current investigation solely on the  basis that Dr. Khan recommends "homeopathic" complementary medicine alternative to vaccines  does not interfere with the state's government's ability to enforce its laws. The government policy [of imposing content specific restrictions on physicians recommendations) does, however, strike at core First Amendment interests of doctors and patients.

336.    Consequently, the issuance of a preliminary injunction against the investigation conducted by the defendants against the Plaintiff based upon recommendations made to his

patients protects Plaintiff's First Amendment rights and does not interfere with defendants' enforcement rights.

**(ii)     Irreparable injury – Fourth Amendment violations.**

337.    Defendants' illegal searches and seizures described above in this Complaint which were conducted on April 29, 2024 and June 12, 2024 amount to a violation of Plaintiff's Fourth Amendment rights. These are past violations which are not redressable by injunctive relief. Nonetheless defendants' past violations of the Fourth Amendment are a relevant factor to be weighed in the context of preliminary relief seeking prospective relief.

338.    The foregoing Fourth Amendment violations in conjunction with: (i) defendants' affirmative counseling of the Plaintiff to violate the law after they suspended his NYSIIS access and their encouragement of the Plaintiff to further continue vaccinations without registering the same with the NYSIIS system; (ii)  their intrusive an aggressive accusatory questioning of the Plaintiff; (iii) the issuance of the unauthorized subpoena seeking documents which are not contemplated by the statutes that the defendants are enforcing, all amount to a pattern of systematic harassment which is actionable under 42 USC 1983 in the form of an application for injunctive relief seeking to prevent prospective violation of constitutional rights.

339.    Furthermore, the defendants continue to violate Plaintiff's Fourth Amendment rights in conjunction with the issue of the subpoena which is unconstitutional under the Fourth Amendment for all of the reasons articulated above.

**(iii)    Irreparable injuries – prospective Fourteenth Amendment violations.**

340. The Plaintiff has shown that the defendants continue to violate his Fourteenth Amendment rights by maintaining and causing to maintain a block on Plaintiff's access to NYSIIS

which amounts to a de facto license restriction which is: (a) without authority and (b) was issued in violation of Plaintiff's Fourteenth Amendment due process rights.

> **(iv)**    **Irreparable injuries – prospective Fifth Amendment violations.**

341.    The Plaintiff has shown the existence of irreparable injury because defendants' denial of access to the NYSIIS amounts to a de facto license restriction which is an unreasonable interference with Plaintiff's right to practice his profession without the same interference.

342.    This in turn amounts to a violation of plaintiff's Fifth Amendment rights to practice his profession without unreasonable government interference.

> **(v)**    **A showing of likelihood of success on the merits has been made.**

343.    To establish a likelihood of success on the merits, 'a prima facie showing of a reasonable probability of success is sufficient; actual proof of the Plaintiff's claims should be left to a full hearing on the merits.'" A likelihood of success on the merits may be sufficiently established even where the facts are in dispute and the evidence need not be conclusive."

344.    In the present case the Plaintiff established likelihood of success on the merits because he has shown that Defendants continue to violate his First Amendment, Fourth Amendment, Fifth Amendment  and Fourteenth Amendment rights as specifically articulated above in this Complaint.

> **(v)**    **Balance of equities and public interest.**

345.    The balance of equities and public interest favor a preliminary injunction here because there is a public interest in avoiding violations of constitutional rights.

346.    For all of the reasons set forth hereinabove the Plaintiff has shown that in the absence of a preliminary prohibitive injunction in the form and substance articulated in paragraphs

18-22 hereinabove, the Defendants will continue to violate his constitutionally protected rights safeguarded by the Fourth, Fifth and Fourteenth Amendment of the US Constitution.

## AS AND FOR A FOURTH CAUSE OF ACTION – INJUNCTION PURSUANT TO 42 USC SEC. 1983.

347.   Plaintiff repeats realleges and reiterates each and every allegations set forth above with the same force and effect as if the same were set forth at length herein.

348.   Plaintiff is seeking a permanent injunction pursuant to 42 USC Sec. 1983 enjoining the Defendants, their agents servant and assigns from doing or causing to do the following:

(a)   Prospectively violating or causing to violate Plaintiff's Fourth Amendment rights by entering Plaintiff's business premises by false pretenses and/or without a warrant or an order signed by a magistrate or judge of a court of competent jurisdiction for the purposes of gathering information under the color of New York law.

(b)   Prospectively violating or causing to violate Plaintiff's Fourth Amendment rights by entering Plaintiff's business premises by false pretenses and/or without a warrant or an order signed by a magistrate or judge of a court of competent jurisdiction for the purposes of gathering information, talking to the Plaintiff under false pretenses, taking photographs of Plaintiff's office and obtaining Plaintiff's consent for entry and statements under false pretenses under the color of New York law.

(c)   Prospectively violating or causing to violate Plaintiff's Fourteenth Amendment due process rights by continuing to restrict his access to the NYISS system and imposing a de facto restriction on Plaintiff's license without affording him the due process protections of PHL Sec. 230 and SAPA Secs 301 through 401 under the color of New York law.

(d)     Prospectively violating or causing to violate Plaintiff's Fifth and  Fourteenth Amendment rights to practice his vocation free of unreasonable government interference by continuing to engage in a systematic pattern of harassment and threats as set forth above in this Amended Verified Complaint under the color of New York law.

(e)     Prospectively violating or causing to violate Plaintiff's First, Fifth and  Fourteenth Amendment rights and the rights provided to him under Education Law Sec. 6527(4)(e) and PHL Sec. 230-9b by intimidating and harassing him for practicing complementary medicine and for talking to his patients about complementary medicine modalities, under the color of New York law.as set forth in this pleading and

(f)     Prospectively seeking to enforce the subpoena issued by the investigator Defendants or prospectively acting or causing to act against the Plaintiff in any manner for refusing to respond to the subpoena and instead seeking judicial review of the same based upon the fact that such action would further violate Plaintiff's Fourth and Fourteenth Amendment rights.

349.    To  state a cause of action under 42 USC Sec. 1983 the Plaintiff must allege that some state official acting under color of state law deprived him of a federal right.

350.    Furthermore, [t]o state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. The requirement that the defendant acted under 'color of state law is jurisdictional. Section 1983 itself creates no substantive rights; it provides  only a procedure for redress for the deprivation of rights established elsewhere.

351.    In this case the Plaintiff alleged that the state actors, namely the investigator defendants and the director of the Bureau of immunizations are prospectively depriving him of his First, Fourth Fourteenth, Fifth and First Amendment rights for all of the reasons articulate above.

352.    In order to receive injunctive relief under 42 USC Sec. 1983, there must be the possibility and threat of prospective violation of constitutionally protective rights.

353.    In this case as set forth above the Plaintiff is seeking  prospective injunctive relief against the state's actors for all of the reasons articulated above.

355.    In addition the Plaintiff has shown that he is likely to succeed on the merits of his underlying claim for injunctive relief pursuant to 42 USC Sec. 1983.

356.    In order to state a claim under Sec 1983, a Plaintiff must allege the violation of a right preserved by another federal law or by the Constitution. That is exactly what the Plaintiff has done in this case. He  alleged violation of his  constitutionally protected rights to be free from unreasonable warrantless searches as protected by the Fourth Amendment of the US Constitution; to be free from actions of license restriction taken in violation of his Fourteenth Amendment due process rights; to be free from unreasonable governmental interference with his practice of medicine in violation of his Fifth and Fourteenth Amendment rights; to be free to speak to his patients about medical recommendations without his First Amendment rights being violated as set forth above in this complaint.

357.    To establish liability under 42 U.S.C. § 1983, a Plaintiff must prove two essential elements: (1) that the Defendants acted under color of state law and (2) that the Plaintiff suffered a deprivation of a constitutional right as a result of that action.

358.    In this case the Plaintiff has shown that the Defendants have acted under the color of New York Law, namely under the guise of an investigation regarding vaccine administration to

flagrantly violate his Fourth Fifth and Fourteenth Amendment rights in the manner described above in this Verified Petition.

359.    Consequently, the Plaintiff will be successful on her  claims for a permanent injunction pursuant to 42 USC Sec. 1983 seeking to prevent further violation of Fourth Amendment rights though the use of the New York investigative process employed by the investigators of the department of Health.

360.    Moreover, permanent injunctions under 42 USC 1983 are issued to avoid the further violation of civil rights and irreparable harm.

361.    For all of the above referenced reasons, the Plaintiff is seeking injunctive relief pursuant to 42 USC Sec. 1983 against the Defendants in the form and substance set forth herein for the purposes of enjoining prospective violation  of his constitutional rights.

### AS AND FOR A FIFTH CAUSE OF ACTION – DECLARATORY JUDGMENT UNDER 28 USC Sec. 1983.

362.    Plaintiff repeats reiterates and realleges each and every allegation set forth herein with the same force and effect as if the same are set forth at length  herein.

363.    Plaintiff is seeking a prospective declaratory judgment against the Defendants for violation of constitutional rights as follows:

(a)    Declaring Public Health Law Sec. 206(4)(a) and Public Health Law Sec. 12-a(1) unconstitutional as applied by the Defendants and as violative of the Fourth Amendment for the purposes vesting the investigators of the NYS DOH with powers to issue subpoenas which they simply cannot have under the Fourth Amendment.

(b)    Declaring Defendants' conduct in baring Plaintiff's access to NYSIIS as unconstitutional and a violation of Plaintiff's Fourteenth and Fifth Amendment rights for all of the reasons articulated hereinabove.

(c)    Declaring Defendants' prospective entry of Plaintiff's premise for the purposes of gathering information, taking photos and engaging in a pattern of harassment as being violative of the Fourth Amendment for all of the reasons articulated hereinabove.

(d)    Declaring the subpoena issued by the investigator Defendants as being violative of the Fourth Amendment for all of the reasons articulated above.

364.    The "'general  purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations. When considering Defendants'  past conduct and the issues of fact regarding defendant's future compliance with the access provisions of the bylaws, a declaration will have the immediate and practical effect of influencing Defendants' future conduct.

366.    Moreover, a declaratory judgment is the proper procedural vehicle by which the Plaintiff can challenge the constitutionality of a statute. Justiciable controversies exist as set forth below.

(i)    **Both PHL Sec. 206(4)(a) and PHL Sec. 12-a(1)
are unconstitutionally as applied and violative
of the Fourth Amendment.**

367.    Defendants invoke both PHL Sec. 206(4)(a) and PHL Sec. 12-a(1) as the source of the investigators' authority to issue the subpoena attached hereto as EX A.

368.    The Plaintiff seeks a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. declaring both statutes as applied unconstitutional.

369.    In an as-applied challenge, the Court must analyze "the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right. In the context of an as-applied vagueness challenge, a court's analysis should be confined to the litigant's actual conduct, and a court should

82

not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute.

370.    To be compliant with the Fourth Amendment the subpoena cannot be issued or enforced by a government investigator. The discretion to enter a premises and inspect and seek information cannot be left to the unfettered discretion of the investigator through the issuance of the subpoena.

371.    To be valid under the Fourth Amendment the agency must have designated officials and a specific process for the issuance of the subpoena which reviews and tempers the discretion of the investigators to enter and inspect a business premises as well as the inspector's request for the issuance of a subpoena. The process is very much like obtaining a search warrant from a magistrate or a judge but instead the magistrate and the judge are replaced by overseeing state officials.

372.    The example of the Fourth Amendment protections codified in PHL 230(10)(k) have been discussed above. No such protections exist in this case where the investigators themselves entered Plaintiff's business premises at whim and effectuated a search of the premises without any checks and balances from an unaffiliated agency official.

373.    As discussed above, PHL Sec. 206(4)(a) vests only the Commissioner with powers to issue subpoenas in aid of hearings and investigations. The statute does not vest the investigator Defendants with powers  to morph themselves into the Commissioner's position  and use the same to anoint themselves with  subpoena issuing powers.

374.    Therefore, Defendants' invocation of PHL Sec. 206(4)(a) as an authority for the issuance of the subpoena by state investigators is as applied unconstitutional.

375.    Similarly, PHL Sec. 12-a(1) is as applied unconstitutional for all of the reasons articulated hereinabove. This statute does not give any authority either for the Commissioner to violate the Fourth Amendment by delegating subpoena issuance powers to the investigators of (b) to the investigators to assume such powers under the same statue.

378.    For all of the above referenced reasons the Plaintiff is seeking a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. declaring PHL Sec. 12-a(1) and PHL Sec. 206(4)(a) unconstitutional as applied.

**(ii)    The subpoena violates the Fourth Amendment.**

379.    The subpoena, EX A hereto, violates the Fourth Amendment for all of the reasons articulated above.

380.    Specifically, the subpoena was issued by investigators in violation of the Fourth Amendment.

381.    The subpoena is oppressive, harassing and indefinite and it seeks documents which are outside the scope of any legitimate investigation which the Defendants investigators have the powers to conduct.

382.    The subpoena is nothing more or less than a prohibited  unfettered inquiry into Plaintiff's general business practices conducted by the Defendants for in hopes of finding violations of the law.

383.    The subpoena is seeking records which are beyond the scope of the investigation. sand beyond Defendants' authority to demand the same.

384.    For all of the foregoing reasons and for all of the reasons articulated above in this Complaint the Plaintiff is seeking a declaratory judgment pursuant to 22 USC Sec. 2201 et.seq. declaring the subpoena illegal and unconstitutional and violative of the Fourth Amendment.

(iii)    **Defendants' denial of Plaintiff's access to the NYSIIS amounts to a violation of Plaintiffs' <u>Fourteenth and Fifth Amendment rights.</u>**

385.    The Defendants violated and continue to violate Plaintiff's Fourteenth Amendment right by imposing a restriction on this license to practice medicine through the denial of his right to access NYSIIS without notice and opportunity to be heard.

386.    The Plaintiff has a plenary license to practice medicine and no restriction has been placed on the same by the Board of Professional Medical Conduct.

387.    As set forth above because of Defendant's conduct of shutting the Plaintiff out of NYSIIS, the Plaintiff is unable to vaccinate his patients.

388.    Consequently the net effect of Defendants' actions is a de facto restriction of Plaintiff's license without following the due process mandates of PHL Sec. 230 and SAPA Sec. 301 through 401.

389.    In addition Defendants' administrative exclusion of the Plaintiff from NYSIIS amounts to a violation of Plaintiff's Fifth and Fourteenth Amendment because their action is an unreasonable interference with Plaintiff's right to practice his profession without unreasonable government interference.

390.    For all of the above referenced reasons the Plaintiff requests that his application for a declaratory judgment pursuant to 28 USC Sec. 1983. declaring Defendants' conduct in denying the Plaintiff access to NYSIIS by administrative fiat and without any formal due process proceeding governed by PHL Sec. 230 and SAPA 301 through 401 as conduct whish prospectively violates Plaintiff's Fifth and Fourteenth Amendment rights.

**(iv)    Defendants' repeated entry of Plaintiff's business premises in two different instances  for the purposes of gathering information taking photos and obtaining statements from the Plaintiff under false pretenses amounts to a pattern of systematic harassment actionable <u>under 42 USC Sec. 1983.</u>**

392.    The Defendants effectuated two unconstitutional searches of Plaintiff's business premises for the purposes of obtaining information taking photographs and eliciting statements from the Plaintiff under false pretenses.

393.    For all of the foregoing reasons articulated in this Amended Compliant , Defendants' conduct amounts to a violation of the Fourth Amendment.

320.    The Plaintiff is seeking a declaratory judgment pursuant to 28 USC Sec. 2201 et.seq. declaring Defendants' entry onto Plaintiff's premises as described in this petition as a pattern of systematic harassment actionable under 42 USC Sec. 1983 and as a violation of the Fourth Amendment.

WHEREFORE the Plaintiff requests that the relief sought in this Complaint be granted in its entirety in the form and substance set forth in the First through Fifth Cause of Action.

Dated: July 11, 2024

Attorney for the Plaintiff
JACQUES G. SIMON ATTORNEY
AT LAW P.C.
*/s/ Jacques G. Simon*
Jacques G. Simon, Esq.,
200 Garden City Plaza Suite 301
Garden City, NY 11530
Bar No. JS 9212
Phone: (516)378-840
Fax:    (516)378-2700
Email: jgs@jacquessimon.com

## DECLARATION PURSUANT TO 28 USC §1746

FAIZ KHAN MD, declares the following pursuant to 28 USC §1746:

1.     I am the Plaintiff in this action and as such I am fully familiar with all of the facts pertaining to this litigation.

2.     I have personal knowledge of the facts recited in this Amended Verified Complaint.

3.     I have read the above Amended Verified Complaint and know the facts therein to be true except to those facts stated to be upon information and belief and as to those I believe them to be true. The basis for my belief are facts and knowledge gathered from internet research and public domain sites citied in the amended complaint.

4.     I make this verification pursuant to CPLR R. 2106.

5.     I declare this 11th day of July, 2024 under the penalties of perjury which may include a fine or imprisonment or both, that the foregoing statements are true. I understand that this document may be filed in an action or proceeding in a court of law.

Dated: July 11, 2024

FAIZ KHAN MD